JAMES McKEE, Administrator, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

1. **Railroads:** ROADWAYS: DUTY TO EMPLOYES. It is the duty of a railroad company to use ordinary care and supervision to keep its roadway in a good and safe condition for the operation of its trains by its employes, to the end that its employes may not be exposed to unnecessary hazards in such employment.

2. ————: NEGLIGENCE: CONSTRUCTION OF ROAD: RULES FOR EMPLOYES: EVIDENCE. A rule of a railroad company, designed for the guidance of its track repairers, that "they must see that no lumber, wood, stone, materials or tools are placed at any time within five feet of the rail," is not evidence that a cattle-guard fence built three feet and ten inches from the rail was improperly constructed. Neither is a rule requiring such employes to keep the fences and cattle-guards in good repair evidence of the negligence of a railroad company in permitting such a fence to stand too close to the track, when it is not claimed that the fence in question was out of repair.

3. ————: ————: ————: DEGREE OF CARE REQUIRED. A brakeman on a freight train, observing that stones were being thrown from the track under one of the defendant's cars, went forward from the caboose, and climbed down the ladder on the side of said car, and while hanging low on the ladder, and looking under the car, with his back toward the locomotive, his head came in contact with a wing fence at the end of a cattle-guard, and he was instantly killed. The evidence showed that the stones which attracted the attention of the decedent were thrown out by a brakebeam, which was down and dragging; that in operating trains it sometimes happens that a brakebeam, or other appurtenance of the trucks of a car, gets out of order, and that it is the duty of the brakeman who discovers it to report the fact to the conductor, and under his direction to ascertain what, if anything, requires attention, and, if necessary, to stop the train; that to make the required examination it may be proper for the brakeman to descend the ladder at the end or on the side of the car, and look under it while the train is in motion. It did not appear, however, that such an event was of common occurrence, nor that any accident caused by the location of a wing fence had ever happened on the road of the defendant, although its road had been operated many years.

*Held*, that conceding that the fence could, with reasonable care, have been so constructed that the decedent would have passed the same without injury, yet the accident was so improbable, and was due to causes of such rare occurrence, that the defendant, in the exercise of reasonable diligence, was not required to provide against it.

4. ———: ———: ———: CONTRIBUTORY NEGLIGENCE: USE OF DEFECTIVE APPLIANCES BY EMPLOYE. The decedent, having been employed as brakeman on the division of the road on which the accident occurred, for about three years, with his runs usually in daylight, and it appearing that there were about four hundred wing fences on such division, substantially like that in question as to plan of construction, and the distance thereof from the track; and it further appearing that the side ladders of a car could be used with safety in examining the condition of trains while passing said wing fences, but that it was apparent to anyone who had observed the width of the spaces between the fences and the passing cars, that a person could not safely swing out from a car while passing such a fence, on its level, more than two feet, *held*, that the decedent must be presumed to have known, from his opportunity to have acquired such knowledge, that the distance between the fence in question and a passing car made it unsafe for one to swing out more than two feet from the car, as he did, and that in exposing himself unnecessarily to such danger, the decedent was guilty of contributory negligence. [BECK, C. J., *dissenting*.]

*Appeal from   Wayne District   Court.*—HON. J. W. HARVEY, Judge.

FRIDAY, OCTOBER 23, 1891.

ACTION to recover damages alleged to have been caused by the negligence of the defendant. There was a trial by jury, and a verdict and judgment in favor of the plaintiff. The defendant appeals.—*Reversed.*

*Freeland & Miles, Cummins & Wright* and *Thos. S. Wright,* for appellant.

*Geo. Hall,* for appellee.

ROBINSON, J.—In September, 1888, Joseph M. Brown was in the employ of the defendant as brakeman on a freight train. The division on which he worked extended from Trenton, in Missouri, to Eldon, in this state. On the twentieth day of the month named, he

left Trenton with his train. When it reached the·
vicinity of Numa he was in the caboose, and, observing
stones which appeared to be thrown from the track
under the second car from the caboose, he went for-
ward to ascertain the cause. He first went down on the
north side of the car, and then climbed back, and went
down on the south side by means of the side ladder.
While hanging low on the ladder, with his back towards
•the locomotive, looking under the car, his head came
in contact with a wing fence at the end of a cattle-
guard, and he was instantly killed. This action is
brought by the administrator of his estate to recover
the resulting damages.

It is claimed by the plaintiff that the defendant was
negligent in allowing the fence to be placed so near the
track as it was, and that the decedent was killed in
consequence, and without fault on his part. The
defendant denies the alleged negligence on its part, and
the alleged absence of negligence on the part of the
decedent, and alleges that he had been employed by the
defendant on the part of its road where the accident
occurred for several years; that during that time the
fence and cattle-guard of which complaint is made
were not changed, and were like the other cattle-guards
and appurtenances along that part of its road,—all of
which was well known to the decedent long prior to
his death.

I. The court charged the jury as follows: "It is
the duty of a railroad company, as regards its employes,
1. RAILROADS:   to use all ordinary care and supervision to·
roadways:       keep its roadway, for the operation of its
duty to em-
ployes.         by its trains employes, in a good and safe
condition, so that the employes may not be exposed to
unnecessary hazards in the operation of its trains."
"The deceased   *   *   *   had a right to assume that
the defendant would use all reasonable care in the
keeping of its road in a good and safe condition for

the operation of its trains by its employes.    *    *    *"
The defendant complains of the portions of the charge
quoted, on the ground that they require the defendant
to keep its road in a safe condition, while the rule is that
it must be kept in a reasonably safe condition.    We do
not think the jury would so understand the charge.
It instructed them that it was the duty of the defend-
ant to use all ordinary and all reasonable care and
supervision to keep its roadway safe, and that, we
think, is the law.    If the road could have been made
safe by such means, then it was the duty of the defend-
ant to make it so.

II.    The only charge of wrong against the defend-
ant is that it negligently placed the fence with which
the decedent came in contact too close to
the track.    That it was a proper appur-
tenance of the road, is not questioned.
The evidence shows that all the cattle-
guards and cattle-guard fences along the line of the
defendant's railway, upon which the decedent had been
employed, were constructed substantially alike.    As
we understand the record each cattle-guard was made
by digging a pit across the roadbed about eight feet
wide and two feet deep.    Across the pit were placed
timbers, and on them were laid ties from twelve to
fourteen feet in length.    At each end of the ties was
constructed a wing fence eight feet in length parallel
to the track.    It was made of two posts, and boards
nailed thereon, and to its center was attached the
right-of-way fence.    The posts of the wing fences
inclined outward somewhat, but, as a rule, were nearly
perpendicular to the surface of the earth, and were
from three feet, five inches to four feet, seven inches
from the rails.    The fence which caused the accident
in question was three feet, ten inches from the rail at
the bottom, and inclined outward at the top three
inches.    There is no competent evidence that it was

2. ——: negli-
gence: con-
struction of
road: rules
for employes:
evidence.

improperly constructed or located. Certain rules of
the defendant, designed for the guidance of its track
repairers, were, however, introduced in evidence over
the objections of the defendant. One of the rules ·so
introduced is as follows: "*Second.* They must see
that no lumber, wood, stone, materials or tools are
placed at any time within five feet of the rail, and that
all gravel and ballast is leveled so as not to endanger
the safety of the trains." It is urged by the appellee
that this rule is evidence that a wing fence should not
be placed within five feet of the track, and it is claimed
that, if the one in question had been placed that
distance from it, the accident would not have occurred.
But the rule cannot be given the effect claimed for it.
It evidently does not refer to permanent structures, but
to loose tools and materials. There would be good
reason for requiring articles which might be readily
moved by the wind, by animals or other cause, without
the concurrence and against the wish of the defendant, ·
to be placed further from the track than appurtenances
of the road, which are permanently attached to the
earth or roadbed.

Other rules required the track repairers to examine
their sections daily to ascertain if the track was safe,
and to observe closely the fences, and to keep them and
the cattle-guards in good repair. It is not claimed
that the fence in question was not in good order, and
the rules gave the repairers no authority to move it.
The rules were, therefore, improperly admitted. The
jury were instructed that they could not presume negli-
gence from the fact that the accident occurred, but
there was no other evidence of such negligence.

III.   It is said, however, that the cattle-guard and
fence could, with reasonable care, have been so con-
structed that the decedent would have
passed the fence in safety. That may be
conceded, and the question then arises

3. $\frac{}{}:\frac{}{}:\frac{}{}$
degree of
care required.

whether the accident was of such a nature that the defendant should have guarded against it. The stones and ballast which had attracted the attention of the decedent, and caused him to descend the ladder on the side of the car, and look under it, were thrown out by a brakebeam which was down and dragging. The evidence shows that, in operating trains, it sometimes happens that a brakebeam or other appurtenance of the trucks of a car gets out of order. When there are indications that such a state of affairs exists it is the duty of the brakeman who discovers it to report the fact to the conductor, and under his direction to ascertain what, if anything, requires attention, and if necessary to stop the train. To make the required examination it may be proper for the brakeman to descend the ladder at the end or on the side of a car, and look under it while the train is in motion. But the evidence does not show that such an event is of common occurrence, and it does show without contradiction that it is not customary for a brakeman to descend the side of a car while it is in motion between stations. It does not appear that any accident caused by the location of a wing fence had ever happened on the road of the defendant before that in question, although its road had been operated many years.

The undisputed facts of this case bring it within the rule announced in *Koontz v. Chicago, R. I. & P. Ry. Co.*, 65 Iowa, 226. The facts involved in that case were substantially as follows: A train of the defendant was stopped on a bridge because the engineer supposed that some of the cars were off the track, or that one of the brakes was set. A brakeman who had been riding in the cab of the engine got down, and in the discharge of his duty proceeded to walk back beside the train to ascertain what cause, if any, there was for stopping. While so engaged he fell through the bridge, and received injuries which caused his death. This

court held that it was not the duty of the railway company to plank every bridge and cattle-guard to prevent accidents to its employes, although it might have anticipated that trains would be required to stop at other than the usual stopping places; and it was said that "ordinary care does not require that every possible contingency must be anticipated and guarded against, but only such as are likely to occur." That such is the rule applicable to cases of this kind is well settled by the authorities. In *Wabash, St. L. & P. Ry. Co. v. Locke*, 112 Ind. 404; 14 N. E. Rep. 395, it is stated as follows: "The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor that the company should have employed any particular means which it may appear, after the accident, would have avoided it. It was only required to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident." In *Loftus v. Union Ferry Co.*, 84 N. Y. 459, the material facts involved were as follows: A child six years of age fell from a bridge or float adjoining the passage-way for passengers going upon or leaving the ferry-boat into the water, and was drowned in consequence of an alleged defect in the guard at the side of the bridge or float. The guard, at the time of the accident, was in the condition it had been in for years. Many people had passed that place yearly, and no accident like that complained of had happened before. The court held that the ferry company was bound to provide suitable and safe accommodations for the landing of passengers, and that the rule of strictest diligence in that respect was the only one consistent with a due regard to the value of human life, and with the relations of the company to the public. It further held that "the rule does not impose upon the defendant the duty of so providing for the safety of passengers that they shall encounter no possible danger, and meet

with no casualty, in the use of the appliances provided by it. It was possible for the defendant so to have constructed the guard that such an accident as this could not have happened, and this, so far as appears, could have been done without unreasonable expense or trouble. If the defendant ought to have foreseen that such an accident might happen, or if such an accident could reasonably have been anticipated, the omission to provide against it would be actionable negligence." The company was held not liable, because it appeared that it had no reason to apprehend an accident like that for which it was sought to make it liable, and that the arrangements it had made were such as experience had, up to that time, shown to be safe and suitable, and sufficient to meet the requirements of its duty.

In *Sjogren v. Hall*, 18 N. W. Rep. (Mich.) 813, a case in which an employe in a steam sawmill sought to recover for injuries sustained in the course of his employment, the supreme court of Michigan said it was the duty of the mill-owner to guard against probable dangers, not to make accidental injuries impossible. It was further stated, in effect, that the fact that the employe, who was not wanting in intelligence nor incapable of judging of probable danger, continued to expose himself without hesitation, and apparently without fear, to such risks as those were, was very conclusive proof either that the employer was not culpable in the matter complained of, or that the employe was inexcusably careless of his own safety. It was further said, in effect, that the fact that, after the accident occurred, it was seen that it could have been easily guarded against, was no reason for holding the employer liable.

To have guarded against the accident in controversy, it was necessary for the defendant to foresee that something might occur to one of its moving trains which would make it proper for an employe to descend

a car to look beneath it, and that he would descend, and
swing himself out from the car while passing a wing
fence, to make the desired examination. It is undoubt--
edly true that the defendant might readily have known
that such a combination of circumstances was possible,
but it is apparent that it was not likely to occur. So
far as the record shows, the accident in question was so
improbable, and it was due to causes of such rare occur-
rence, that the defendant, in the exercise of reasonable
diligence, was not required to provide against it. It is
readily seen now how it could have been avoided,
but it does not appear that anyone anticipated it,
or anything of that nature. It is not shown that
complaint of the wing fences was ever made to the
defendant, nor that it had any reason to anticipate
accidents from them. They were properly constructed,
so far as the record discloses, and the defendant had
reason to believe, from the length of time during which
it had operated the road without accident from them,
that they were properly located.

IV. Another objection to a recovery by the
plaintiff on the record submitted is that it clearly

4. ——:——:——:
contributory
negligence:
use of defect-
ive appliances
by employe.

appears the accident would have been
avoided by the use of ordinary care on the
part of the decedent. He had been
employed as brakeman on the division on
which the accident occurred in all about three years,
and his runs were usually made in daylight. On that
division there were about four hundred wing fences, all
of which were substantially like that in question, as to
plan of construction and distance from the track. The
distance between the wing fences and the sides of pass-
ing box cars was about two feet, and it is shown with-
out contradiction that the side ladders could be used
with safety in examining as to the condition of trains in
passing the wing fences in question. But it must have
been apparent to anyone who had observed the width.

of the spaces between the fences and passing cars, that a person could not safely swing out from a car while passing such a fence on its level more than two feet, and that an attempt to do so would be apt to result in serious injury.

It is said that there is no evidence that decedent knew the distance of the fence from the passing car, but that claim is in conflict with the approved rules of evidence. It was said in *Muldowney v. Illinois Central Ry. Co.*, 39 Iowa, 620, that "the means of knowing by ordinary care is evidence of knowledge." If it be shown that a given statement was made in the presence and hearing of a person possessed of the ability to hear, the presumption, conclusive in the absence of a showing to the contrary, is that he heard it. If it be shown that an event, capable of being seen by any ordinary observer, occurred in the presence of a person possessed of the ability to see, and that his attention was at the time directed to it, it will be presumed, until the contrary appears, that he saw it. So a person engaged in a particular employment will be presumed to have that knowledge of the dangers incident to his employment which he could have acquired by the use of ordinary diligence.

In *Mayes v. Chicago, R. I. & P. Ry. Co.*, 63 Iowa, 563, it was shown that the plaintiff's intestate was a switchman or brakeman in the employment of the defendant, and that his death was caused by the negligence of the defendant in failing to place blocks between the rails and the guardrails at the switches. It was said by this court, in effect, that the knowledge of defects possessed by an employe, and his ability in the exercise of ordinary diligence to acquire knowledge thereof, are questions of fact to be determined on the evidence submitted in cases where the defects or dangers are not open and obvious to every one serving

Vol. 83—40

in the capacity of an employe; but that the rule was
not applicable to that case, for the reason that the
decedent had worked over the track in question for six
weeks, and must be presumed to have known of the
defect, and that it was dangerous.   The plaintiff in
*Mooney v. Lower Vein Coal Co.*, 55 Iowa, 671, sought to
recover for injuries received from a falling roof while
working as a miner in the mine of the defendant.   This
court held as follows: "The true rule is that if plain-
tiff knew, or by the exercise of ordinary care might have
known, of the unsafe condition of the roof, and he con-
tinued to work in the dangerous place without protest
or complaint, and without being induced to believe that
a change would be made, he assumed the risk and can-
not recover."   In *Muldowney v. Illinois Central Ry.
Co.*, *supra*, this court approved the following:   "When
an employe has the means of acquiring knowledge, by
the exercise of ordinary care and diligence, of the
defects or imperfections in the machinery or cars about
or upon which he is employed, and continues in his
employer's service without objecting to, or protesting
against, the use of such defective or imperfect cars or
machinery, he will be held to have assumed all the
risks incident to the use of the cars and machinery in
such defective condition."   The court cited a large
number of cases as supporting the rule.   In *Perigo v.
Chicago, R. I. & P. Ry. Co.*, 52 Iowa, 276, it appeared
that the defendant had erected a coal platform between
two of its tracks at Winterset, and, for convenience in
unloading and taking on coal, placed it so near one of
the tracks that a passenger car, moving along the track,
passed within seven inches of the platform at one end,
and within four and a half inches of it at the other end.
The platform had been in the position described two
years, when a baggageman in the employment of the
defendant, while engaged in the discharge of his duties
in helping to make up a train, was knocked off the car

by the coal platform, thereby receiving injuries which resulted in his death. He had been in that employment for more than two years, and had assisted in making up the train during nearly every day of that time. In considering an instruction in which the rule under consideration was stated, the court said: "It is now the established doctrine of this court, in harmony with the current of authority elsewhere, that an employe who knows, or by the exercise of ordinary diligence could know, of any defects or imperfections in the things about which he is employed, and continues in the service without objection, and without promise of change, is presumed to have assumed all the consequences resulting from such defects, and to have waived all right to recover for injuries caused thereby."

The rule, as thus stated, was approved in *Wells v. Burlington, C. R. & N. Ry. Co.*, 56 Iowa, 524. The facts involved in that case were that the plaintiff's intestate was a brakeman in the employment of the defendant, and had been so engaged for more than four years upon that part of its road where the accident occurred. He was killed by being knocked from the top of a freight train by the timbers of a bridge over which the train was passing. The bridge timbers with which he came in contact were a little more than five feet above the top of the car, while he was more than six feet in height. There were other bridges of like construction and height on that part of the road, over which he had often passed. In the opinion written by Beck, J., it was held that an instruction embodying the rule under consideration should have been given. It was also said, in regard to the dangers of the employment, that "the knowledge of the intestate and his failure to make objections may be shown by circumstances and inferred from his conduct. Direct proof on these points is not required. The knowledge of the dangerous character of the bridge may be inferred

from opportunities of obtaining such knowledge in the exercise of ordinary care." In *Gould v. Chicago, B. & Q. Ry. Co.*, 66 Iowa, 590, it appeared that the plaintiff's intestate, a locomotive engineer in the employment of the defendant, was fatally injured while in the discharge of his duties. He had been instructed to make a certain trip without stopping at any station, unless signaled or specially directed so to do. It was the duty of the conductor or brakeman to make signals to the engineer from the rear end of the train when passing stations. While the train was passing a station on the trip the engineer went to the fireman's side of the engine, and leaned out of the gangway, looking back for the expected signal. He was almost instantly struck by a water crane, and injured as stated. The water crane, or the frame supporting it, was about two feet from the floor of the gangway upon which the engineer was standing when he was struck. This court approved an instruction to the effect that if the crane was so located as to be reasonably safe for trainmen operating trains in a reasonably safe and prudent manner, then the defendant was not guilty of negligence in the location of the crane, and disapproved one which stated, in effect, that, if the crane was placed in such close proximity to the track as to be dangerous to the persons operating the trains, then the defendant might be found guilty of negligence in locating and erecting it. In considering that instruction, the court, speaking by Beck, C. J., stated that "it is not true that a railroad company is to be regarded as negligent in erecting or maintaining contrivances or things for use in the operation of their roads, for the reason that they are dangerous to the persons operating the trains. Indeed, the whole business of operating trains is dangerous. It is full of perils to those employed therein. Because there is danger, it does not follow that the companies are neg-

ligent as to the things from which the danger springs. The instruction should have expressed the thought that, if the crane was dangerous to persons operating trains in the exercise of ordinary care, the defendant was negligent in constructing it."

The rule under consideration is too well grounded in reason and authority, and has been too long followed by this court without dissent, to be now abandoned. When applied to the facts in this case, its effect cannot be a matter of doubt. The decedent, during his long term of service on the road in question, could not have failed to observe, in the use of ordinary diligence, that the wing fences were too near the track to permit a person to swing out from the bottom of a passing car with safety. This is especially true if the trainmen were required to descend the sides of moving cars, and look beneath them as was done in this case, so frequently that the defendant should be charged with knowledge of such examinations, and be required to provide for them. The decedent may not have known the exact distance of any wing fence from the track, but he could not have avoided knowing that he could not safely do that which he attempted if he had given the matter that attention which his duty to his employer and to himself demanded. The accident occurred at about noon of a pleasant day. The track where it occurred was straight. There were no obstructions, and decedent could have seen the fence which caused his death, from his position at the bottom of the ladder, for a distance of nine hundred and thirty feet before it was reached. There was nothing in the condition of the car which he sought to examine, as it appeared at the time to justify him in exposing himself to any unusual risk. There was nothing to indicate such an impending danger to the employes or property of the defendant, nor to passengers, as justified the decedent in acting without regard to his own safety.

It appears that a brakebeam or lever, or a brake loose and dragging, might have thrown the stones from the track, or that a swingbeam might have thrown them from ballast filled in too full. It is not shown that when stones were thrown as were those in question it was regarded as indicating unusual danger, or anything of a serious nature, althought it made an examination as to the condition of the train necessary. That the decedent was not alarmed by what he saw is shown by what he did. It was his duty to report to the conductor if he saw anything wrong with the train. He made no report in this case, but proceeded without orders, evidently not for the purpose of averting an apparent and impending danger, but to ascertain if one existed. The conductor and a fellow brakeman were near him in the caboose when he left it, but he did not regard the cause of his leaving of sufficient importance to call their attention to it.

In *Hosic v. Chicago, R. I. & P. Ry. Co.*, 75 Iowa, 686, it appeared that a brakeman was injured in attempting to set a brake in obedience to a signal which was unusual, and indicated that prompt action was required. It was held that, under the facts of that case, the brakeman was justified in attempting to obey the signal, although in so doing he knowingly incurred risk to himself; but the rule of that and similar cases has no application to this case. It clearly appears from the undisputed facts of the case and the authorities cited that the defendant is not shown to have been negligent in the provision it has made for the safety of its employes in the matter in controversy. The case of *Loftus v. Union Ferry Co., supra,* is even authority for the conclusion that it has exercised that higher degree of care which a passenger might have demanded. On the other hand, it appears that, had the decedent used reasonable care to ascertain and avoid the danger to

which he exposed himself, the accident which caused
his death could not have occurred.

What we have said disposes of all questions dis-
cussed by counsel which are likely to arise on another
trial. For the reasons indicated the judgment of the
district court is REVERSED.

BECK, C. J. (*dissenting*).—I. The undisputed evi-
dence shows that the plaintiff's intestate, Joseph M.
Brown, had been for several months employed as
a brakeman upon trains running on that part of the
road where the accident resulting in his death occurred.
The deceased, being in the cupola of the caboose, while
the train was running in daylight under ordinary con-
ditions, saw stones flying from the ballast of the road-
bed, so that they could be seen by him from the cupola.
He knew from this indication that some part of a car
was coming in contact with the roadbed, and thereupon
went upon the top of the car, thence down its side upon
the ladder, and returned to the top, went down the
ladder on the other side, and swinging himself from
the ladder so that he could do so, looked under the car
to see what part of it was dragging upon the road-
bed. While in this position his head came in contact
with the upright part of a cattle-guard, and he was
instantly killed. There was a panel of fence extending
along the cattle-guard on the side furthest from the
track, to the middle of which the fence was attached.
The fence was three feet, ten inches from the rail at
the bottom, and four feet and one inch at the top.
Other cattle-guards varied, as to the distance from the
rails but little, one way or the other from this measure-
ment. It was found that a brakebeam was down, and
was dragging upon the roadbed, which caused the stones
to be thrown off the track. The deceased was looking
backward when he was killed. He was not directed
by the conductor to examine and report as to the cause

of the stones flying from the track. There was evidence tending to show that an ordinary freight car projects about two feet beyond the rail, and that it was the duty of a brakeman, upon observing indications of a brake-beam or the like being down, to examine into the matter and ascertain the cause of the indications, and this could be done only by looking under the car in the manner deceased attempted.

II. Was it the duty of the deceased, upon observing indications of parts of the car or machinery near the track being out of order, to ascertain what was the cause of the indications in order to prevent injury to the train from the defective parts of the car? Evidence was submitted to the jury to the effect that upon such an occurrence it was customary for the brakeman to do just as the deceased attempted to do, namely, descend the ladder, and obtain a view of the parts under the car, so that whatever was necessary to avoid danger could be done. A witness for defendant testified that it was the duty of the deceased to report the fact to the conductor, and from him have orders to descend the side of the car. But, if it be assumed that he should have pursued this course, it does not follow he was negligent in acting without the conductor's orders. It was the case of the discharge of duty without waiting for orders. It is very plain that the emergency required prompt action; that the deceased acted just as the emergency required. Now, to hold that the deceased, because he · did the act he would have been required to do had he reported to the conductor, was negligent, would condemn him for prompt intelligence and faithful services, intended to protect the property of the defendant and the lives of himself and other trainmen. But we cannot hold that, in such a case, a trainman must, before he acts, report for orders. Such a rule would often expose life and property to destruction, for in the management of trains which move at a high rate of speed prompt-

ness and celerity of action are to be commended, indeed required, in the right discharge of duty by the trainmen. I need not further present reasons for holding that the deceased, in the discharge of his duty, descended the ladder and attempted to see the parts of the car out of order. But I may repeat what I have before intimated, that preservation of human life and protection to the property of the defendant required deceased to do this duty, and do it promptly.

III. Now, if it were the duty of the deceased to descend the ladder and look under the car, it cannot be doubted that the defendant was required to construct the cattle-guards so that his life would not be destroyed in the discharge of duty. Therefore, if the parts of the cattle-guard were so near the car as to expose the body of the deceased to contact therewith, they were negligently constructed. A great deal more could be said upon these points, but I refrain from continuing their discussion.

IV. It is insisted that, as the act done by the defendant was rarely demanded, the indications—the flying of the stones—were something unusual, and the defendant was not required to anticipate the occurrence, and so provide that danger to its employes would not result therefrom. We cannot say, as a matter of law, that the occurrence of the brakebeam or other timber under the car being down is so unusual that it could not or ought not to have been anticipated. Indeed, the evidence tends to show that such things were quite familiar to at least one witness, who had been a trainman; and it is a matter of common knowledge that the timber and irons of the machinery and trucks are exposed to breaking, and from other causes they become out of order. Timbers, irons or stones, not connected with cars, may become fastened to parts of the trucks, and other things of this character may occur, all of which would, if not removed, cause

destruction of property and of life.   The character of
these dangers can only be known by a view under the
cars.   Now, surely the defendant ought so to construct
its track, cars and cattle-guards that a trainman may
in safety so act when such occasions arise that life and
property will be protected.   The evidence in this case
shows that the part of the cattle-guard was about two
feet and two inches from the side of the car, and prob-
ably even less from the ladder upon which the deceased
was supporting himself when he was killed.   The jury
were authorized to find that deceased was killed while
in the discharge of his duty, and that the discharge of
that duty, and duty of that character, may be required
at any time, or at any place, upon a moving train,
and, therefore, that danger from cattle-guards so near
the track should have been anticipated and provided
against by the defendant.   The cases and authorities
cited in the majority opinion are not in conflict with
these views and conclusions.

V.   It was the duty of the defendant to so con-
struct the cattle-guards as not to endanger the safety
or life of the employes operating trains on the railroad,
and, under familiar rules, intestate was authorized to
believe that the defendant had done its duty in this
regard, and to believe that no danger of the character
caused by the cattle-guard existed.   He could rest in
this belief, and act accordingly, until he obtained
actual knowledge that the danger existed.   *Muldowney
v. Illinois Central Ry.  Co.*, 36 Iowa, 463; *Kearns v.
Chicago, M. & S. P. Ry.  Co.*, 66 Iowa, 599; *Snow v.
Housatonic Ry. Co.*, 8 Allen, 441; *Gibson v. Pacific Ry.
Co.*, 46 Mo. 163; *Faren v. Sellers*, 39 La. Ann. 1011;
3 S. Rep. 363; *St. Louis, Ft. S. & W. Ry. Co. v.
Irwin*, 37 Kan. 701; 16 Pac. Rep. 146; *Dorsey v. Phillips*,
42 Wis. 583; *Chicago & N. W. Ry. Co. v. Swett*, 45
Ill. 197; *Porter v. Hannibal & St. J. Ry. Co.*, 71 Mo.
66; *Lewis v. St. L. & I. M. Ry. Co.*, 59 Mo. 506; *Petty*

*v. Hannibal & St. J. Ry. Co.*, 88 Mo. 306; *Devlin.v. Wabash, St. L. & P. Ry. Co.*, 87 Mo. 545.

VI.   If the deceased knew, or could have known in the exercise of reasonable diligence, the danger to which he exposed himself by attempting to discharge the duty he undertook to protect defendant's property, by descending the ladder in order to discover the cause of the stones from the roadbed flying out from under the car, and thus voluntarily put his life at hazard, he was negligent, and thereby contributed to the injury resulting in his own death, and his representative cannot recover.   But there is no evidence tending to show that he had such knowledge, or that in the exercise of reasonable diligence he could have acquired it. It is not shown that he, or any other employe of the defendant, knew the distance the fences of the cattle-guards were from the cars or the rails, nor that he or they knew just what distance between the car and the fence would enable one to do what he attempted with safety, or what distance would render the act danger-ous.   It is not shown that any employe of the defend-ant or the deceased had any reason to believe that he exposed himself to danger from the fences by attempt-ing to look under the car.   It is a case where the employes and witnesses of the defendant are exceeding wise after a life has been sacrificed, and measurements have been made.   No one appears to have thought of the danger before.   This very view is taken in the opinion of the majority to excuse the defendant's neg-ligence, namely, that the accident was so improbable and unexpected that the defendant cannot be regarded as negligent in maintaining the fence so near the car; but the victim of the accident is to be held by the majority of the court to have been negligent for not knowing the danger, while the defendant is to be held free of negligence because the accident could not have been anticipated.   I protest against such discrimina-

tion in favor of the defendant. The simple facts are that the fence was dangerously near the track, and there is no evidence tending to show that the intestate knew it, or that in the exercise of reasonable diligence he could have acquired knowledge of such fact. The considerations distinguish the case from *Mayes v. Chicago, R. I. & P. Ry. Co.*, 63 Iowa, 562; *Gould v. Chicago, B. & Q. Ry. Co.*, 66 Iowa, 590; *Wells v. Burlington, C. R. & N. Ry. Co.*, 56 Iowa, 524, and other like cases cited in the majority opinion as applicable on this point. In my opinion the judgment of the district court ought to be affirmed.