THE STATE OF KANSAS v. JOHN R. MILLER.

1. MURDER — *Verdict, Sustained.* The defendant, who was charged with murder, admitted that he shot and killed the deceased, but claimed that the act was justifiable. Upon an examination of the evidence given on the trial, it is held to be sufficient to sustain a verdict of murder in the second degree.

2. ———— *Testimony Given by Defendant.* The testimony given by the defendant on his preliminary examination, and which is reduced to writing and signed by him, may, when properly identified, be offered in evidence by the state against him.

3. CONSPIRACY, *Sufficiently Shown; Evidence.* Ordinarily a conspiracy should be established *prima facie* before the acts and declarations of one co-conspirator can be given in evidence against another, and in this case it is held that the conspiracy was sufficiently shown to warrant the admission in evidence of the acts and declarations of those who were charged with aiding and abetting the defendant in the commission of the offense.

4. WITNESS — *Changing Testimony.* When the witness admits that the testimony which she formerly gave in the case was untrue, and then proceeds to state what she claims is a correct relation of the facts, full inquiry should be allowed with respect to what led her to make the so-called untrue statements, as well as the influences which subsequently caused her to change her testimony; but where such witness has quite fully stated what was said and done by those who were urging her to return to the witness stand and tell the truth, the refusal of the question as to what she was crying about in their presence, is not such an error as will work a reversal of the judgment.

5. CHARGE OF COURT, *How Considered.* The charge of the court is to be considered as an entirety, and if, when so considered, it correctly states the law, the mere misuse of a word in one part of the charge, which it appears could not have misled the jury, will not warrant a reversal.

6. NEW TRIAL; *Former Conviction, No Bar.* When the defendant, charged with murder, was convicted of manslaughter in the fourth degree, and thereupon moved for and obtained a new trial, he thereby placed himself in the same position as if no trial had been had, and the conviction for manslaughter in the fourth degree was no bar to a subsequent conviction of a higher degree of the offense charged. (*The State v. McCord*, 8 Kas. 232.)

7. ———— *Jury; Conduct.* The mere fact that some members of the jury, during a recess of the trial, took up and examined a transcript of the evidence given in the former trial of the case, will not require a new trial when it is not shown that the jurors read any part of what was written in such transcript.

### Appeal from Osborne District Court.

INFORMATION for murder, charging *John R. Miller* with the murder of Delbert J. Tunison, on May 19, 1885. At the September Term, 1885, the defendant was convicted of murder in the second degree, and sentenced to imprisonment in the state penitentiary for a term of ten years. Defendant appeals. The opinion contains a sufficient statement of the facts.

*Hays & Pitts,* and *Walrond, Mitchell & Heren,* for appellant.

*A. Saxey,* county attorney, for The State.

The opinion of the court was delivered by

JOHNSTON, J.: On June 1, 1885, an information was filed in the district court of Osborne county, charging John R. Miller with the murder of Delbert J. Tunison, and also charging that John Cranshaw and Albert Whitaker aided and abetted Miller in the commission of the crime. At the trial, had the following September, a verdict was returned finding that John R. Miller was guilty of manslaughter in the fourth degree. Upon his motion a new trial was granted, and immediately entered upon. This trial resulted in a conviction of murder in the second degree, from which he appeals to

this court. He alleges numerous grounds of error, which we will consider and dispose of in the order of presentation here.

The first point made is, that the evidence is not sufficient to sustain the verdict. The defendant acknowledged that on May 19, 1885, he shot and killed Delbert J. Tunison with a gun loaded with bird-shot, but he claims that the killing was justifiable, because the deceased was in the act of stealing certain horses, and also that there were reasonable grounds to believe that he was about to be killed by the deceased, or was in danger of great bodily harm. A statement of some of the leading facts together with what the testimony offered by the state tended to show, will be enough to make it appear that the verdict was not without support.

It appears that on Saturday, May 16, 1885, a difficulty occurred between Tunison and his wife, the exact nature of which is not shown. Her father, Jeremiah Miller, who lived eight miles away, learned of the trouble on Sunday evening, went at once to the residence of Albert Whitaker, who was jointly charged with the defendant, and who was a near neighbor of the Tunisons, and remained there until Monday forenoon. Before noon of that day, and while Tunison was absent from home, Jeremiah Miller, accompanied by Albert Whitaker, went to Tunison's house and hitched a pair of horses found there to a wagon and took Mrs. Tunison and the children to his home, carrying with them some goods and a cow found upon the premises, which property, together with the horses, was claimed by Mrs. Tunison as her individual property. The horses were also claimed by Tunison to be his property. The defendant is a son of Jeremiah Miller, and has made his home with him when not employed elsewhere, as also did his co-defendant, John Cranshaw, who is a son-in-law of Jeremiah Miller. At this time the defendant was at work in Osborne City, which was distant eleven miles from his home, and Cranshaw was engaged in Glen Elder, still farther away. On Monday night the defendant and John Cranshaw hired a team at Osborne City, and drove home, where they

found Jeremiah Miller and wife, Charles Miller, Albert Whitaker, Mrs. Tunison, and Mrs. Cranshaw.

The testimony of the state tended to show that all of the parties anticipated that Tunison would come there during the night to retake the horses claimed by him. It was also testified that on the day previous the defendant visited his home and heard of the difficulty between Tunison and his wife, and then threatened that he would kill Tunison within a week. There was also testimony that Cranshaw stated to parties in Osborne, from whom he hired the team on Monday night, that they wanted the team to go out home; that Tunison and his wife had separated, and she had gone home; and that Tunison was expected to go there that night, and if he did there would be trouble, and they were going out to take a hand in it. The parties all remained in the house until about ten o'clock at night, when a noise was heard at the barn, and defendant and Charles Miller went out there but found no one. They did not return to the house, but took a position in the barn where the horses stood, and where it was so dark that one object could not be distinguished from another. The defendant was armed with a shot-gun, which he says he accidentally found in the barn, and he and Charles Miller remained upon watch in the barn undisturbed until about midnight, when Tunison came into the barn, and without interference unloosed and took out a horse which proved not to be one of those claimed by him, but belonged to Cranshaw. He tied this horse to a post near by, and returned to the barn. While he was out, the defendant changed his position in the barn, holding the gun in such manner that it could be readily used, and when Tunison was stepping into the barn the second time, the defendant shot him in the neck, when he fell backward and expired in a few hours afterward. This testimony, together with many circumstances which are not stated, tends strongly to show that the killing was wholly without justification.

We do not overlook the fact that there was testimony contradictory to some extent of that which has been stated, nor

that testimony was given of threats made by Tunison that he was going after the horses and would kill anyone who interfered with him, and burn and destroy Miller's property, and that these threats were communicated to the defendant and other members of the family. There was also testimony in behalf of the defendant that when Tunison entered the stable door at the time he was shot, the defendant ordered him to halt, and that Tunison made a motion with his right hand as if to shoot, at the same time stating, "I have the drop on you, and I will kill you for luck." Under the testimony and theory of the defendant, that Tunison came there to steal horses, and that while attempting to prevent him from committing a felony the deceased drew a revolver and pointed the same at the defendant in such a way that he had reasonable grounds to believe that his life was in imminent danger, he was justified in shooting the deceased. But the jury were at liberty to disbelieve the testimony of the defendant, and to accept the theory of the state, as they manifestly did do, that Tunison went there not to steal horses, nor to injure the Millers in person or property, but for the sole purpose of recovering the horses, which he claimed as his own, and that the defendant had no reasonable cause to apprehend a design on the part of the deceased to kill or injure him.

There is considerable in the testimony of the defendant which tends to weaken his claim, and which correspondingly strengthens the theory of the state. It is claimed by the state that the deceased did not bring a revolver with him, and that the one said to have been found upon his person after he was killed was placed there by some member of the Miller family. One improbability in the testimony of the defendant to which our attention has been called, is the statement claimed to have been made by Tunison, just before he was shot, that he had the drop on the defendant and would kill him, when it appears that it was so dark in the barn where the defendant stood that it was impossible for the deceased to have seen him. The revolver claimed to have been found on his person was not discharged by the deceased, and yet every barrel was

empty when it was examined. That the deceased would carry an empty revolver in such a case, or would draw and point it into the darkness, seems somewhat unlikely. Besides, the location of the wound, as well as the course taken by the shot which penetrated his body, would indicate that the deceased was not in such a position as he naturally would have assumed if he had been aiming at or attempting to shoot the defendant. Then again, it is admitted that they anticipated that he was coming there during the night after the horses, but instead of warning him to desist, or taking any steps to prevent his trespassing upon the premises, they lay in wait and killed him with but little if any warning. So far as the protection of the property was concerned, it would seem that the killing of the deceased was unnecessary. In addition to the defendant and his brother, who were in the barn, there was Jeremiah Miller, Albert Whitaker and John Cranshaw, who were at the house within easy call, and who knew of his coming, and could have assisted in driving him away. If the trespass could have been prevented, or if the threatened danger to the person of the defendant, or to the property which he claimed to be guarding, could have been avoided or prevented by any other reasonable means within his power, the killing of the deceased was unnecessary and inexcusable. (*Weaver v. The State*, 19 Tex. Ct. of App. 547; same case, 33 Alb. L. J. 408.) But we do not assume, nor is it our province, to weigh the testimony that was given. It was conflicting, and the conclusion of the jury depended very largely upon the credibility of the witnesses produced upon the respective sides. The province of weighing the testimony in such cases belongs

1. Murder; verdict sustained. exclusively to the jury, and if upon inspection of all the evidence offered in the case we find enough to sustain the conclusion of the jury, the verdict will not be disturbed. A careful reading of the record leaves no doubt in our minds that the verdict is warranted by the testimony.

During the trial the state introduced and read in evidence the testimony given by the defendant at the preliminary ex-

amination, over his objection. The testimony was signed by the defendant, and constituted his written declaration concerning the offense for which he was being tried, and if properly identified, was admissible in evidence. It is now claimed that it was not identified, but this objection was not made in the court below, where it seems to have been conceded by both parties to have been the evidence which he gave, and cannot be now made.

*2. Testimony given by defendant.*

It is next claimed that the court erred in permitting W. B. Bowen and Samuel Bowen to testify to statements made by John Cranshaw in the absence of the defendant, regarding the purpose for which the defendant and Cranshaw desired a team to go to Miller's on Monday night, and what they proposed to do when they got there in case Tunison should come after the horses. It will be remembered that Cranshaw was charged with having aided and assisted the defendant in the murder of Tunison. Cranshaw's statements were admitted upon the theory that he was a co-conspirator with the defendant. It is conceded that "ordinarily when the acts and declarations of one co-conspirator are offered in evidence against another co-conspirator, the conspiracy itself should first be established *prima facie*, and to the satisfaction of the judge of the court trying the cause. But this cannot always be required. It cannot well be required where the proof of the conspiracy depends upon a vast amount of circumstantial evidence, and a vast number of isolated and independent facts." ( *The State v. Winner*, 17 Kas. 298.) However, in this case we are of the opinion that when the testimony objected to was offered, enough had already been shown, and Cranshaw was so far implicated with the defendant, as to warrant the court in admitting the testimony. The court fully protected the interests of the defendant in this regard when it instructed the jury that they should disregard the evidence of all statements made by Cranshaw in the absence of the defendant, unless they found from the evidence that before the statements were made Cranshaw had entered into a conspiracy or understanding with the defendant to do some unlawful act to the

*3. Conspiracy sufficiently shown.*

person of the deceased, and that such statements or preparations were made for the purpose of furthering the object of such conspiracy or understanding.

Several objections, most of which are immaterial, are urged to the rulings of the court upon the testimony given by a witness for the state named Zoe Eaton. This witness was keeping company with the defendant, and had accompanied him to Jeremiah Miller's on the Sunday preceding the killing of Tunison. The county attorney hearing that the witness had stated that the defendant while in her company on that day spoke of the difficulty of Tunison with his wife, and at the same time threatened to take his life, called her as a witness for the state. At that time she denied having made such statements, and denied that the defendant had spoken of Tunison or made any threats against him in her presence. Before the examination was concluded, however, she returned to the witness stand and changed her testimony, giving a detailed account of her conversation with the defendant, in which he spoke harshly of the deceased, and threatened to take his life. Considerable testimony, some of which was objected to, was given by her concerning

4. Witness; changing testimony.

the causes which led her to correct the evidence first given. Each party claimed that she had been tampered with by the other, and under the circumstances it was competent to examine closely into the influences which led to the contradictory statements, in order to determine how much credit should be placed upon the testimony given upon the final trial. On cross-examination she was asked what she was crying about in the probate judge's room. This question was refused. It was in this room where, at the instance of her father and others, she consented to go back upon the witness stand and relate what she now insists is the truth. Having stated that she was crying while there, the question was a proper one. It was probably excluded by the court because the witness had already quite fully stated what was said and done in that room to influence her to correct her testimony. This being so, we

think the defendant was not prejudiced by the refusal of the question asked the witness.

The eighth, ninth, tenth, and eleventh objections are without merit, and the twelfth is that the court would not permit the defendant to prove that the property taken by Mrs. Tunison and her father from her husband's premises was her separate and individual property. This objection is not tenable. It would have been improper to have entered upon the trial of the right to or ownership of the property in this proceeding. It did appear that the property was claimed in good faith by each of the parties as his or her individual property, and this was the extent to which it was proper to go.

The thirteenth and fourteenth objections are without force, and the fifteenth is a criticism of the instructions given to the jury. We have examined them, and find that the defendant has no cause for complaint except where the court, in speaking of the law of self-defense, states that "before a person can avail himself of the defense that he used a weapon in defense of his life, he must *satisfy* the jury that that defense was necessary," etc. Separating this passage from the general charge, and considering it alone, it might appear to shift the burden of proof respecting one phase of the case upon the defendant, while it is well established that the presumption of innocence is with the defendant, and that the burden of proof rests on the state throughout the trial. But the instructions are to be considered as an entirety, and in another portion of the instructions the court specifically charges the jury that "the burden of establishing the guilt of the defendant rests upon the state, and in no stage of the case does the burden shift upon the defendant to prove his innocence, or to prove that the killing of Tunison was justifiable." The erroneous use of the word "satisfy," of which complaint is made, might possibly have resulted to the prejudice of the defendant if the court had not, in treating upon the same subject, clearly stated the burden to be upon the state, and we therefore think that the jury could not have been misled.

5. Charge of court, how considered.

Another instruction complained of is where the court instructed the jury that they might, if the evidence warranted it, find the defendant guilty of murder either in the first or second degree. Upon the first trial the defendant was found guilty of manslaughter in the fourth degree. He was awarded a new trial upon his application, and the claim is that he could not afterward be convicted of a higher degree of crime than manslaughter in the fourth degree. This question has already been determined against the contention of the defendant, where it was decided that the granting of a new trial on the motion of the defendant places him in the same position as if no trial had been had. (*The State v. McCord*, 8 Kas. 232.)

6. New trial; former conviction, no bar.

It is finally urged that the motion for a new trial should have been granted upon the grounds of improper conduct of the jury, and improper remarks of the counsel for the state in the argument to the jury. It appears that during the last trial the county attorney made use of the stenographer's transcript of the testimony taken on the first trial, and affidavits were offered that several members of the jury, during a recess of the trial, took this transcript from the table in the court house where it was lying, and were apparently reading it; and that the transcript contained testimony not produced before the jury in the final trial. A sufficient answer to this objection is, that it was not shown that the members of the jury who handled the transcript read any portion of the evidence. The court finds specially from all the testimony offered on the motion for a new trial, that it did not appear that the jury read any part of what was written in the transcript.

7. Conduct of jury.

We find nothing in the argument of counsel, nor in any of the errors assigned, that would warrant a reversal of the judgment, and it will be affirmed.

HORTON, C. J.: An examination of the record satisfies me that the district court committed some errors upon the trial, but I do not think that these errors affected the result in vio-

lation of substantial justice; and § 293 of the criminal code provides that on an appeal (in criminal cases) the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. Therefore I concur in the affirmance of the judgment of the district court.

VALENTINE, J.: I concur in the judgment of affirmance in this case. For while I think the court below committed a few errors, yet I have no doubt of the correctness of the final result reached. The errors evidently did not affect any of the defendant's substantial rights.