# THE STATE OF KANSAS V. FRED. SORTER.

| | |
|---|---|
| 52 | 531 |
| 54 | 201 |
| 52 | 531 |
| 56 | 368 |
| 52 | 531 |
| 71 | 353 |
| 52 | 531 |
| 74 | 198 |
| 52 | 531 |
| 78 | 853 |
| 79 | 692 |
| 80 | 391 |

1. INFORMATION—*Indorsing Names of Additional Witnesses.* The defendant in a criminal case has no cause to complain of a ruling permitting the state to indorse the names of additional witnesses upon an information, where sufficient time is given to make inquiry regarding the character and credibility of the proposed witnesses before the introduction of any evidence in the case.

2. HOMICIDE—*Jurors—Challenges, Overruled.* The defendant, who is charged with murder, admitted the killing of the deceased, but claimed that he was justified in doing so on the ground of self-defense. Several jurors stated on their *voir dire* that they had read and heard of the killing, and held the opinion that the deceased had been shot and killed by the defendant, but they had not formed or expressed any opinion as to the guilt or innocence of the defendant. It appeared from the examination that their minds were free from any previously formed opinions on any of the material facts or questions involved in the case. The court overruled these challenges and retained the jurors. *Held,* That no substantial error was committed.

3. CHALLENGES, *Sustained.* *Held,* Also, that the trial court did not commit error, under the circumstances of the case, in sustaining the challenges to the several persons who were examined upon their *voir dire* to serve as jurors.

4. REMARKS OF COUNSEL—*Verdict, Undisturbed.* If the language employed by counsel for the state in his opening statement is deemed improper, it is the duty of the defendant's counsel to make an objection, and secure a ruling thereon from the trial court; and, ordinarily, where this is not done no review of the ruling can be had; and, under the facts of this case, it is *held,* that there was no such misconduct of counsel as would justify a disturbance of the verdict.

5. WITNESSES—*Impeachment—Rule—Exception.* While ordinarily a party may not impeach his own witnesses, nor offer evidence for that purpose, he is not conclusively bound by the statements which the witness may make; and where a party has been entrapped or deceived by an artful or hostile witness, he may examine such witness as to whether he had not previously made contrary statements; and may, in the discretion of the court, be permitted to show what such contrary statements were.

6. DEFENDANT, *As a Witness—Practice.* Where a defendant freely offers himself as a witness, and voluntarily gives testimony in a preliminary examination or trial, such testimony may be introduced and read against him in the final trial of the cause.

7. TESTIMONY *of Defendant—Practice.* In such case, the state is not required to read the whole of the testimony given by the defendant; but when testimony as to any particular subject or fact is offered, then all that relates to that subject or fact should be placed before the jury.

8. QUARRELS *of Defendant and Deceased — Inquiry into.* Where there have been previous controversies and difficulties between the defendant and the deceased, the existence of such controversies and difficulties may be shown by the defendant, in order to show the state of feeling between them; but the court would not be warranted in trying the merits of such controversies, nor in entering upon a detailed examination of the facts as to who was right and who was wrong in any former quarrel between them.

9. INSTRUCTION, *Not Incorrect.* The jury were instructed, in substance, that a person is presumed to intend to do that which he voluntarily does do, and intends all the natural, usual and probable results of his own voluntary acts; and if the jury found that the defendant shot and killed the deceased, as charged in the information, and that the natural and ordinary consequences of such shooting would be the death of the deceased, then the presumption would be that the defendant shot with the intent to kill him. The jury were informed in the same connection that this was not a conclusive presumption, but might be rebutted and overthrown by the evidence. *Held,* That this instruction was not incorrect nor prejudicial.

10. MANSLAUGHTER—*Instruction.* In charging the jury, the court defined manslaughter in the fourth degree, as laid down in § 26 of the crimes act, but refused to call the attention of the jury to manslaughter in the fourth degree, as defined by § 27 of the crimes act. *Held,* That there was no evidence in the case which warranted a a charge under the latter section.

11. INSTRUCTION, *No Error in Giving.* The court charged the jury that "evidence of previous good character is competent evidence in favor of the party accused, as tending to show that he would not be likely to commit the crime charged against him, and may under some circumstances be sufficient to create a reasonable doubt of his guilt when it would not otherwise exist; but if the jury believe from the evidence that the defendant did commit the crime in question, as charged in the information, it will be your duty to find the defendant guilty, even though the evidence may satisfy your minds that the defendant, previous to the alleged crime, had sustained a good reputation and character as a peaceable, quiet, law-abiding citizen." *Held,* That there was no error in giving this instruction.

12. GENERAL CHARGE—*Self-Defense.* It is not error for the court to refuse the giving of instructions requested by the defendant where the propositions of law stated therein have already been fairly

stated in the general charge of the court. And *held*, further, that, under the facts and circumstances of this case, no error was committed by the court in charging the jury upon the doctrine of self-defense.

13. NEW TRIAL—*Affidavits*—*Record.* Affidavits and evidence offered upon a motion for a new trial in a criminal cause are no part of the record unless they are incorporated in a bill of exceptions.

*⟨Appeal from Wyandotte District Court.⟩*

PROSECUTION for murder; trial at the December term, 1890; verdict, guilty of murder in the second degree; new trial denied; the defendant, *Fred. Sorter,* sentenced to confinement in the penitentiary for 10 years. He appeals. All the material facts are stated in the opinion.

*Hale & Fife,* for appellant.

*John N. Ives,* attorney general, and *Hutchings & Keplinger,* for The State.

The opinion of the court was delivered by

JOHNSTON, J.: This was a prosecution for murder. The information charged Fred. Sorter with murder in the first degree, in the feloniously killing of Enoch J. Link, on the 30th day of May, 1890, by shooting him with a double-barrel shotgun. The trial resulted in a conviction of murder in the second degree, and the defendant was sentenced to confinement in the penitentiary for a period of 10 years. In the course of a protracted trial, a great many exceptions were taken to the rulings of the court, and such of them as seem to us to require attention will be noticed in their order of presentation.

When the case was called for trial, the county attorney asked permission to indorse the names of additional witnesses upon the information. Objection was made by counsel for the defendant, on the ground that they had no opportunity to examine into the credibility and standing of the witnesses. It was represented by the prosecution that these witnesses lived in the immediate vicinity of the place of trial, and that notice of the application had been given to the defendant as

soon as they learned the names of the witnesses and the necessity for calling them.   The court permitted the names to be indorsed upon the information, and, on the application of the defendant's counsel for delay, ruled that no testimony would be received within 48 hours from the time notice was served upon the defendant that such application would be made.   The defendant has no cause for complaint on these rulings.   Sufficient time was given the defendant to make full inquiry regarding the proposed witnesses before the reception of any evidence.   Only one of the witnesses whose names were so indorsed was called to testify, and her testimony appears to be wholly immaterial.   Besides, the court, in the furtherance of justice, is invested with power and discretion to permit the names of witnesses to be indorsed upon the information after it has been filed, and even after the trial has actually commenced. (*The State v. Cook*, 30 Kas. 82; *1 he State v. Adams*, 44 id. 135.)   There was no abuse of that discretion in this instance.

1. Information—indorsing names of additional witnesses.

Application for a continuance was made by the defendant on account of the absence of one Thomas Moody, who was a resident of Wyandotte county, but was then absent from the state.   He had testified in favor of the defendant at a previous trial, and soon afterward went to South Dakota.   The application for a continuance was denied; and a sufficient reason for the ruling was, a want of diligence on the part of the defendant in an effort to obtain the testimony of this witness.   Before the ruling, the prosecution offered to consent to the reading of Moody's testimony which was given at the former trial, and the court, in denying the application, ruled that the testimony taken at the former trial might be read in evidence.   The defendant availed himself of this privilege, and all of the testimony previously given by Moody was read to the jury.   No error was committed by the court in overruling the application for a continuance.

Several exceptions were taken to the rulings of the court in impaneling the jury.   Three persons called as jurors, and who

were examined as to their qualifications, were challenged by the defendant, but their challenges were overruled. Only one of them served on the panel which tried the case. One of them, Peacock, had read an account of the transaction in the newspapers at the time of its occurrence, and had heard it spoken of by others who had read a like account. From the information derived from the newspaper accounts he formed the opinion that Link was shot by the defendant and died from the gunshot wound inflicted by him; but upon further inquiry he answered that he had not formed or expressed any opinion relative to the guilt or innocence of the defendant, and knew nothing about the facts of the case except what he had learned from the newspapers. He was peremptorily challenged by the defendant. When another of them, Canary, was examined as to his competency, he stated that he had read the newspaper accounts of the shooting, about the time of its occurrence, and had an opinion that Link was dead, and that he died from the effects of a gunshot wound inflicted by Sorter, and that he still entertained the same opinion. He stated, however, that he had had no acquaintance either with the defendant or with the deceased, and had no personal knowledge of any of the facts of the case, nor had he talked with anyone who had personal knowledge of the facts; that he had neither formed nor expressed an opinion as to the guilt or innocence of the defendant, and that he could fairly try the case, and would not be influenced· by anything that he had heard or read of the occurrence. He was held to be a qualified juror, but was subsequently peremptorily challenged by the defendant. Charles Stover was challenged for incompetency, but was retained by the court and was a member of the jury that tried the case. He had read one account of the killing in a newspaper about the time it was done, and this was the only information he ever had about it, but he had formed no opinion therefrom as to the guilt or innocence of the defendant. He had formed an opinion that Link was shot and killed by Fred. Sorter, and he stated that he would continue to think so until the opinion was removed by evi-

dence, but he did not hold nor had he ever expressed any opinion as to whether the defendant was guilty of any crime by reason of the shooting and killing of Link. He had never had any acquaintance with either the defendant or the deceased. We think no prejudicial error was committed by the court in its rulings upon these challenges. It is true that the jurors held the opinion that Link was shot by Sorter, and had died from the effects of the wound which he had inflicted; but it appears that this was not a controverted issue between the parties. The defendant had always admitted that he had shot and killed Link, but his claim was that he was justified in doing so, on the grounds of self-defense. The defendant was of course entitled to a jury whose minds were free from any previously-formed opinions on any material fact or question involved in the case; but an opinion upon a fact openly conceded by the defendant could hardly influence the jurors in determining the guilt or innocence of the defendant. He insisted from the beginning that he had fired the fatal shot in repelling an assault made upon him by Link. He testified fully as to the occurrence upon a former trial, and the fact that he had shot and killed Link was then admitted by him. In the final trial, he was again a witness in his own behalf, and stated in detail the circumstances of the killing, making the same admission. It therefore appears that the killing of Link was not a material issue in the case; and as the jurors challenged had not formed nor expressed an opinion as to whether the killing was justifiable or not or upon any material fact in issue, no substantial error was committed in overruling the challenges. (*The State v. Wells*, 28 Kas. 321; *The State v. Guild*, 40 id. 258.)

2. Homicide—jurors—challenges, overruled.

Complaint is also made of rulings excluding several jurors from the panel. One of them, who claimed that he had neither formed nor expressed an opinion as to the guilt or innocence of the defendant, lived in the neighborhood of the occurrence, was acquainted with the defendant, and had heard the facts of the case discussed by quite a number of persons,

some of whom claimed to know all about the occurrence. Another who thought he could give the defendant a fair trial had read the evidence of the former trial, from which he had formed an opinion in the case. Another of them was acquainted with the defendant, had heard and read a great deal about the facts, and had expressed an opinion as to the guilt or innocence of the defendant, but was of the opinion that he could fairly and impartially try the case. Another was a brother-in-law of one of the counsel for the defendant, and had talked with several persons in regard to the facts, and was not positive but that he had talked with his brother-in-law in regard to the matter. Another was present a short time during the former trial and heard a witness testify in the case, had read the newspaper accounts of the case, and held an opinion which was not a mere impression. It appears to us that there is no good reason to complain of the action of the court in excusing these jurors. In impaneling a jury, a large discretion is necessarily confided to the court, and there appears to have been some reason in each case for the action taken. From what appears in the record, the judge might, as it seems to us, have over-ruled some of these challenges without committing error; yet he not only heard their answers, but saw their conduct, and was better able to determine whether they were suitable jurors. The rule applicable in retaining jurors does not apply in discharging them; and so it has been said,

3. Challenges, sustained.

"that a trial court has, and should have, a very extensive and almost unlimited discretion in discharging a person called to serve on a jury, who might, in the opinion of the court, not make the fittest or most competent person to serve on the jury in the particular case. We can hardly see how the court could commit substantial error in discharging any person from the jury when 12 other good, lawful and competent men could easily be had to serve on the jury."

(*The State v. Miller*, 29 Kas. 43; *Stout v. Hyatt*, 13 id. 232; *A. T. & S. F. Rld. Co. v. Franklin*, 23 id. 74; 1 Thomp. Trials, § 88; 12 Am. & Eng. Encyc. of Law, 360.)

There is complaint made about the opening statement of counsel for the state, but only one objection was made at the time. We have examined that objection and find nothing substantial in it, and we discover very little reason for complaint of any portion of the statement. As the attention of the trial court was not called to other objections now complained of, we cannot examine them. (*St. L. Ft. S. & W. Rld. Co. v. Irwin,* 37 Kas. 701.)

4. Remarks of counsel—verdict, undisturbed.

The permission granted counsel for the state to cross-examine one of their own witnesses is a matter of complaint. After the witness had testified in reference to the presence of another at the place and about the time that the fatal shot was fired, and had denied seeing him there, the state inquired if he had not testified differently on a former occasion, and the defendant objected, claiming that they had no right to contradict or destroy the testimony of their own witness. Counsel for the state then informed the court that they were surprised at the testimony that had just been given, for the reason that the witness had given contrary testimony on former examinations, and they asked the right to call his attention to his former statements, and also to show what testimony he then gave. The court decided that they should be permitted to examine the witness as to whether he had previously given contrary testimony, and that they might cross-examine the witness if necessary, to ascertain whether he was mistaken in the testimony now given. They then called the attention of the witness to evidence which he had formerly given at the coroner's inquest, the preliminary examination, and at the former trial of the cause. As to some of the testimony, the witness stated that he could not remember whether he had so testified or not, but that if he did he was mistaken as to the facts. When the state proposed to offer the evidence previously given by the witness, it was excluded by the court upon the objection of the defendant. As a general rule, a party cannot impeach his own witness, nor interrogate him with a view to affect his credibility merely. Neither can he intro-

duce other evidence for that purpose.   But while 5. Witnesses— he may not impeach him, he is not conclusively impeachment —rule—ex- bound by the statements which he may make. ception.

And where a party has been entrapped or deceived by an artful or hostile witness, he may examine the witness as to contrary declarations, and may, in the discretion of the court, be allowed to show what such contrary declarations were.   In *Johnson v. Leggett*, 28 Kas. 605, it was held that,

" The matter is left largely within the discretion of the trial court; that that court may, when it thinks the interests of justice require, permit a party to show that he is unexpectedly mistaken in the testimony of any witness; that he had good reason to expect other testimony, and what such other testimony would be."

In the present case, there were some apparent inconsistencies in the statements of the witness, although they were largely cleared up and explained when his explanations were given.   It would seem that there had been no abuse of discretion in permitting the state to probe the recollection of the witness, and to obtain from him explanations of what appeared to be inconsistencies in the testimony he had given. The course adopted enabled the witness to correct and explain his former sworn statements, and was an act of justice, not only to the parties, but to the witness himself.   The corrections and explanations were such that the court did not deem it important to allow the introduction of the testimony previously given by the witness. (*Bullard v. Pearsall*, 53 N. Y. 230;  1 Whar. Ev., § 549;  1 Thomp. Trials, § 512;  Greenl. Ev., § 444.)

Another exception was taken to the ruling of the court, in allowing the state to read portions of the testimony given by the defendant at the first trial of the case.   This exception cannot be sustained.   The defendant freely offered himself as a witness on the former occasion, and gave testi- 6. Defendant, as mony in his own behalf; and it is now settled a witness— practice. that the testimony of a defendant voluntarily given on a previous examination may be read in evidence

against him. (*The State v. Miller*, 35 Kas. 328; *The State v. Taylor*, 36 id. 329; 1 Thomp. Trials, § 647.)

A further objection in this connection is, that the court permitted counsel for the state to read portions of the testimony, while defendant insisted that if any was offered all should be read. This objection is not tenable. When former testimony as to any subject or fact is offered, all that relates to that fact or subject should be placed before the jury; but the state was not required to read such parts as related to a wholly different subject from that which they desired to present. (*Commonwealth v. Keyes*, 77 Mass. 323; *Starin v. The People*, 45 N. Y. 333, 339; *Rouse v. Whited*, 82 Am. Dec. 337; *Railway Co. v. Howland*, 9 S. E. Rep. 1040; 2 Whar. Ev., § 1108.) The court was very liberal to the defendant in this respect, as it permitted him to read to the jury the whole of the testimony which he had given on the former occasion; and hence, he has no reason to complain. What has been said respecting the reading of the former testimony of the defendant is somewhat applicable to the objection made to the reading of that which had been given by Mary Baker. A portion of her former testimony was read, with a view of contradicting her statements made upon the witness stand at the present trial; and the court permitted the reading of the whole. Her testimony all related to one occurrence and subject, and when a portion of it was offered the reading of the whole was permissible. There had been previous disagreements and quarrels between the deceased and the defendant, and while the court permitted the defendant to show that such controversies had occurred, that threats had been made, and that bad feeling had existed between them, it refused to go into and try the merits of these difficulties. To have entered upon a detailed examination of the facts as to who was right and who was wrong in these, would have obscured the real issue and have served no good purpose. The court allowed a liberal scope of examination as to the disposition of the deceased toward the defend-

7. Testimony of defendant— practice.

8. Quarrels of defendant and deceased— inquiry into.

ant, and the acts and threats of the deceased tending to show that the defendant, as a reasonable man, believed that he was in danger of losing his life or in suffering great bodily harm at the time he fired the fatal shot, were allowed to go to the jury.

There are other objections to the admission of testimony, all of which have been examined, but none of them are deemed to be material nor to require special attention. There is sufficient testimony, we think, to sustain the theory of the state and the verdict of the jury. The deceased was a blacksmith, who worked in a shop situated upon a street or highway in Quindaro, and in the neigborhood of the defendant's home. The defendant was a market gardener, who made daily trips to the Kansas City market, driving a double team attached to an ordinary market wagon. He usually started about 3 o'clock in the morning, and, on account of the dangers attending such an early trip, he states that he usually carried a weapon for defense. The ordinary route of travel to the market was past the blacksmith shop in which Link worked. The testimony tends to show that bad feeling existed between them, and that, in passing the shop, the defendant had on several occasions made provoking remarks, grimaces and gestures toward the deceased, and that on one occasion the deceased had been provoked into throwing missiles of some kind at the defendant as he passed. On the day of the homicide, the defendant took with him to the market a loaded double-barrel shotgun, and in returning from the market in the forenoon of that day he drove by the blacksmith shop, the horses being in a trot as he approached and passed the shop. About the time of passing the shop, the deceased came out of the shop with some kindling with which to build a fire around some wagon tires on the roadside, near the door of the blacksmith shop. One witness states that defendant about that time muttered or mumbled something in a low voice, and immediately afterward discharged his gun in the direction of the deceased, either at him or over his head. The horses immediately broke into a gallop, and rapidly bore

the defendant away from the shop and the deceased, and, when he was from 50 to 80 feet from the wagon tires where the deceased was building a fire, the defendant turned around in his wagon and fired the second shot, and whether one or both shots took effect is a subject of doubt, but, after the firing of the second shot, Link staggered and fell, and immediately expired.

The defendant states that he first saw Link come out of the shop when he was 50 yards away; that Link was in the act of building a fire around the wagon tires, as stated; but that he made no remarks to Link as he passed, and that while Link was stooped over putting the shavings on the fire, he grabbed up some stones and commenced to throw; that Link threw some stones, which did not strike the defendant, when defendant turned around in his wagon, picked up the gun, and fired a shot over Link's head; that Link then picked up some more stones and came toward defendant, and while he was in the act of throwing, the second shot was fired. He states that he fired the first shot over Link's head to make him go back, and the second was fired to save his own life. The deceased, however, was unarmed, and the claim of the state is that no stones were thrown by him on this occasion, and no hostile demonstration was made toward the defendant. It would seem from the testimony that, under any theory, the defendant had little cause to apprehend such personal danger as would justify the shooting and the homicide. He was in a wagon, while Link was on foot. Defendant's team was on a gallop, bearing him rapidly from danger, if any there was; and when the team was going at great speed, and about 80 feet away from Link, the defendant laid down the lines, turned about in his wagon, and fired. It is difficult to see any necessity or justification for that shot, and the jury had sufficient testimony for the conclusion which it reached.

Complaint is made of the charge given to the jury. And first, with reference to the fifteenth instruction, which charged that a person is presumed to intend to do that which he voluntarily does do, and intends all the natural, usual and prob-

able results of his own voluntary acts; and if they found that the defendant shot and killed Link, as charged in the information, and that the natural and ordinary consequences of such shooting would be the death of Link, that the presumption would be that the defendant shot with the intent to kill him. The jury were informed in the same connection, however, that this was not a conclusive presumption, but might be overthrown and rebutted by the evidence. This is a proper instruction, and its language does not warrant the inference that the burden of proof in the case was shifted from the state.

*9. Instruction, not incorrect.*

In the eighteenth instruction, the court declared that "the involuntary killing of another by a weapon, or by means neither cruel nor unusual, in the heat of passion, in any cases other than justifiable homicide, shall be deemed manslaughter in the fourth degree." (Crimes Act, § 26.) The defendant requested the giving of an instruction under § 27 of the crimes act, defining manslaughter in the fourth degree, which results from the "act, procurement or culpable negligence of another;" but the request was properly refused by the court, as there was no evidence in the case to sustain such a theory, nor which would warrant a charge under that section of the statute.

*10. Manslaughter —instruction.*

The court failed to add a clause to the twenty-second instruction which was requested by the defendant. It related to the question of self-defense; but as that subject was quite fully presented to the jury, the refusal affords no ground for a reversal.

Complaint is made of the refusal to give the twenty-eighth instruction, with reference to the good character of the defendant, but the court did not overlook the subject, as it gave the following instruction:

"Evidence of previous good character is competent evidence in favor of the party accused, as tending to show that he would not be likely to commit the crime charged against him, and may, under some circumstances, be sufficient to create a reasonable doubt of his guilt when it would not otherwise

exist; but if the jury believe from the evidence that the defendant did commit the crime in question, as charged in the information, it will be your duty to find the defendant guilty, even though the evidence may satisfy your minds that the defendant, previous to the alleged crime, had sustained a good reputation and character as a peaceable, quiet, law-abiding citizen."

There is no good cause to complain of this instruction. It fairly recognizes the rule that proof of good character is an ingredient to be considered by the jury in determining the guilt or innocence of the defendant. Objection is made to the latter part of the instruction, and especially to the use of the word "crime." The court, however, does not assume, as seems to be claimed, that a crime had been committed, but says no more than that, if from all the evidence, including that relating to good character, they find the defendant did commit the crime or offense charged in the information, it will be their duty to convict, although the defendant may have previously sustained a good reputation and character. In several other instructions the court had advised the jury that they could not convict the defendant unless the proof satisfied them of his guilt beyond a reasonable doubt. (*The State v. Douglass,* 44 Kas. 627; *The State v. Spendlove,* 47 id. 168; *People v. Mead,* 50 Mich. 229; *People v. Sweeney,* 30 N. E. Rep. 1005.)

*11. Instruction, no error in giving.*

The court refused to give the twenty-seventh instruction requested by the defendant, which related to the individual duty and responsibility of each juror; but as the court had sufficiently instructed the jurors in this respect in its seventh instruction, a repetition was unnecessary.

The instructions given, from the twenty-sixth to the thirty-fifth, inclusive, were given at the request of the state, and, although they are criticised, we think they are applicable under the facts of the case and substantially correct. In the twenty-eighth instruction it is said, that

"If, at the time the defendant fired the fatal shot, the deceased was not engaged in making any assault upon him, or

in any way threatening or menacing the defendant, and was not armed with any deadly weapon, and did not have anything in his hand, but was standing still, facing the defendant, and the defendant was in his wagon, at a distance of 80 feet or more from the deceased, his horses moving in the opposite direction in a gallop, and the defendant was not in imminent danger of receiving any injury from the deceased, and was under no reasonable apprehension of receiving any injury from deceased, that then the defendant was not justified in shooting deceased, even though the deceased had immediately before that time assaulted him and hit him with a stone "

This instruction presented the theory of the state, and correctly states the law.  The only criticism that can be made upon the instruction is, where the court fixes the number of feet which the defendant was from the deceased at the time of the shooting.  The defendant himself stated that he thought he was about 50 or 60 feet away, but it might have been over 80 feet, and a reading of the whole testimony leads us to believe that he was about 80 feet from the deceased when the last shot was fired.  The court, however, does not assume that the facts stated were true; but as there was testimony offered by the state tending to prove these facts, an instruction applicable to such facts, if found to be true, was given.  Some of the instructions complained of state the law strongly in favor of the theory of the state, but we see no incorrect proposition of law, nor anything which would justify a disturbance of the verdict.

Some complaint is made that the court did not embody the facts and theory of self-defense, relied on by defendant, in an instruction; but no such instruction was prepared or requested by the defendant.  In the charge of the court, however, the general theory of self-defense relied on by the defendant was fully presented to the jury.  If the defendant desired additional instructions, he should have requested them; and, as none were requested, the court did not commit any reversible error in its failure to give them.  (*The State v. Pfefferle*, 36 Kas. 96; *The State v. Peterson*, 38 id. 204; *The State v. Estep*, 44 id. 572.)

12. General charge— self-defense.

An attempt has been made to raise the question as to the misconduct of the jury. Attached to the record are affidavits to the effect that some of them drank intoxicating liquors after they were impaneled and before the verdict was returned. It is only proper to state in this connection, however, that it does not appear that any liquor was drunk during the course of the trial, or while they were considering of their verdict, and no juror was intoxicated or under the influence of liquor while performing his duties. These affidavits, however, form no part of the transcript, and cannot be considered by this court. They were not incorporated in the bill of exceptions, and this was necessary in order to make them part of the record. (*The State v. Devine*, 49 Kas. 252; 30 Pac. Rep. 522, and cases cited.) But if the testimony upon this question had been properly included in the transcript, it would not have afforded grounds for a new trial. It has already been determined in this court that the mere drinking of intoxicating liquor by the jurors during the progress of the trial, not furnished by the prevailing party, and which has no appreciable influence upon their conduct, is not of itself sufficient to set aside a verdict. (*Perry v. Bailey*, 12 Kas. 539; *Larimer v. Kelley*, 13 id. 78; *The State v. Tatlow*, 34 id. 80.)

13. New trial—affidavits—record.

We have examined all of the points presented in appellant's brief, some of which it is not deemed necessary to specially notice, and find in them no sufficient ground for a reversal, and hence the judgment of the district court will be affirmed.

All the Justices concurring.