## THE ST. LOUIS, FORT SCOTT & WICHITA RAILROAD COMPANY v. W. H. IRWIN.

1. TRACK AND BRIDGES; *Duty of Company.* It is the duty of a railroad company to so construct its tracks and bridges as will make them safe for its employés to perform their duties; and a party entering its service has a right to assume that this obligation has been discharged.

2. EMPLOYÉ — *Hazards — Extent of Knowledge.* When an employé enters the service of a company he assumes all ordinary hazards incident to such service, and also other perils of which he had knowledge; but the conductor of a train is not required to know of all defects and obstructions that may exist on the road over which he runs.

3. DEFECT — *Known to Company, Unknown to Employé — Liability.* In an action by a conductor of a freight train for injuries received while in the service of a company, it was shown that while engaged in the performance of duty on the top of a car, and while the train was passing through a bridge, he collided with the overhead timbers, some of the braces of which were not sufficiently high to clear a man's head when standing erect on the top of an ordinary car, and thereby suffered the injuries complained of. *Held,* That the company having knowledge, and the conductor not knowing, nor having reasonable opportunity to know, of the defect, a liability arises against the company, and in favor of the conductor, for the injuries sustained.

4. ORDINARY CARE — *Injury — Finding, not Disturbed.* Although the conductor had passed over the bridge daily for three months, he stated that he did not know of the dangerous proximity of the braces to the top of the cars, to which position his duties seldom called him; that he had ridden on top of the cars only once prior to the accident; and it being shown that a person could stand on one part of the roof of a car with safety, while if standing on another part he would collide with the braces of the bridge; and it was further shown to be very difficult to determine with accuracy the distance between the top of the moving car and the overhead timbers of the bridge: *Held,* That whether the conductor acted with ordinary care at the time of the injury was a proper question for the determination of the jury, and its finding that he did ought not to be disturbed.

5. MISCONDUCT OF COUNSEL; *Review, When.* To properly present the question of misconduct of counsel, in argument, to the supreme court, objections should be made to the alleged improper language, and a ruling had thereon by the trial court; and generally, when this is not done, no review of the question can be had.

| | |
|---|---|
| 37 | 701 |
| 49 | 395 |
| 37 | 701 |
| 52 | 53 |
| 52 | 538 |
| 37 | 701 |
| 55 | 282 |
| 37 | 701 |
| 57 | 479 |
| 37 | 701 |
| 58 | 245 |
| 37 | 701 |
| 68 | 832 |
| 37 | 701 |
| 69 | 122 |
| 69 | 728 |
| 37 | 701 |
| 76 | 113 |
| f77 | 144 |
| f77 | 784 |
| 37 | 701 |
| 82 | 139 |
| 82 | 853 |

*Error from Sedgwick District Court.*

ACTION against *The St. Louis, Fort Scott & Wichita Railroad Company* by *W. H. Irwin,* to recover damages for personal injuries suffered by him while serving the company in the capacity of a freight conductor. The plaintiff alleged that the company negligently constructed and provided a defective and unsuitable bridge upon its road, and that on December 6, 1884, while Irwin was on a freight train in the discharge of his duties, the train passed over and across the low and defective bridge, and although acting with due care and caution, he forcibly and violently came in contact with the overhead timbers composing the bridge, and was thereby violently thrown down from said train, and was injured in his head, spine, body, and limbs, disabling him from performing any manual labor, causing him to linger in great bodily pain and mental anguish, and making him an invalid for life. The company answered, denying that it was negligent, and alleging that the injury was the result of his own carelessness and negligence. At the October Term, 1886, of the district court of Sedgwick county, the cause was tried with a jury, which, in a general verdict, awarded the plaintiff $12,000. The following findings of fact were also returned in response to particular questions proposed by the respective parties:

### QUESTIONS BY DEFENDANT.

" 1. Is the bridge referred to in this action by the plaintiff and the witnesses, a standard Howe truss bridge? No.

" 2. Is the Howe truss bridge referred to in this action a standard railroad bridge in general use by railroad companies, in the state of Kansas and other states? Do not know.

" 3. What is the height of the bridge in question in this case from the top of the rail on the track to the under side of the top chord or beam? Cannot determine.

" 4. What is the distance from the top of the rail to the top of the caboose, both at the outer edge and at the center of the caboose? Cannot determine.

" 5. What is the distance from the top of the rail on the ground to the brace, by a line drawn perpendicularly? Cannot determine.

"6. What is the distance from the top of the caboose proper, to the under side of the top chord or beam of the bridge? Cannot determine.

"7. How far do you find it is from the top and outer edge of the caboose on which plaintiff was injured, to the corner brace of the bridge, by a line drawn perpendicularly? Cannot determine.

"8. What act do you find the plaintiff was engaged in at the time he came in contact with the brace? Attending to his duties.

"9. What part of plaintiff's body came in contact with the brace? Left side, near the back.

"10. How far from the caboose was plaintiff when he saw the Santa Fé train had stopped? One to four cars from the caboose.

"11. After plaintiff saw that the train on the Santa Fé road had stopped, to what, if anything, was he then giving his attention till he was struck by the brace? Giving his attention to his train.

"12. Did McGinnis, the agent at El Dorado, at any time when requested, refuse to flag the Santa Fé crossing? No.

"13. At whose request did Leggett, the brakeman, flag the Santa Fé crossing on December 6, 1884? By conductor W. H. Irwin.

"14. How long had plaintiff been acquainted with the bridge in question at the time of the accident? About three months.

"15. Was plaintiff at the time of the accident in the full possession of his faculties, and had he prior to that time had reasonable opportunities to know all about the bridge and the manner of its construction? To the first part of the question, yes; to the second part of the question, no.

"16. Was there any place on the caboose used by the plaintiff at the time of the accident, upon which plaintiff could have stood erect and passed through the bridge without injury? Yes; in the center of the car.

"17. How long had plaintiff been operating trains on that part of defendant's road on which the bridge in question is situated, prior to the accident? About three months.

"18. How many times per day did plaintiff pass through said bridge while in the service of defendant and operating trains over that part of defendant's road? Usually twice per day.

"19. Could the plaintiff, during the time he was in the service of the defendant, by the use of ordinary care and pru-

dence, and by making use of his ordinary faculties, have ascertained the character of the bridge in question, and the manner of its construction? No.

"20. How many times per day, during the daytime, did plaintiff pass through the bridge while in the service of defendant? Usually once per day.

"21. Had plaintiff seen the corner braces in the bridge in question prior to the time of his injury? Cannot determine.

"22. Did the plaintiff, prior to the time of his injury, considering the length of time he had been in the service of the railroad company, and especially of defendant, have a reasonable opportunity to inform himself of this bridge and the manner of its construction with regard to the corner braces and their proximity to the top of the ordinary caboose cars used on defendant's road? No.

"23. Did the plaintiff at any time prior to his injury complain to defendant, or any of its officers, of the dangerous character of the bridge in question? No.

"24. In what direction was Irwin's face at the time the accident occurred — to the east, or west? Northwest."

### QUESTIONS BY PLAINTIFF.

"1. Were the braces on the bridge in question in such close proximity to the top of cars of ordinary height as to unnecessarily increase the risk and danger to which the employés engaged in running cars through said' bridge would be exposed? *Ans.:* Yes.

"2. Was the plaintiff injured by coming in contact with said bridge and braces, on the 6th of December, 1884, while in the necessary and proper discharge of his duty as a conductor of a freight train, while in the employ of the defendant? A. Yes.

"3. Was the plaintiff injured while in the exercise of ordinary care and prudence on his part, having regard to the management of the running of the train, the time, place and circumstances, and his means of knowing to what risks he was exposed at that time and place? A. Yes.

"4. Was the plaintiff guilty of any negligence upon his part having regard to all the facts and circumstances under which he was placed at that particular time and place? A. No.

"5. Is it not true that the plaintiff was ignorant of the precise distance of the said braces from the railroad track, and from the top of the car, and ignorant of the risk he was exposed to at that time? A. Yes.

"6. If you answer 'Yes' to the last question, then is it not also true that the plaintiff could not even by the exercise of ordinary care and prudence on his part have known just the risk and danger to which he was exposed at that time and place, having regard to the facts and circumstances that surrounded him at that time and place? A. Yes, it is true.

"7. Do you find as a fact that under part of this bridge a man of ordinary size can pass with safety while standing on an ordinary car, while standing on another part of the car he would be struck on the shoulders, or below the shoulders? A. Yes.

"8. If you answer 'Yes' to the last question, then does not such construction of this bridge render it more dangerous, and more deceptive to employés as to the risks they incur while standing on a car passing through, than if the bridge were low enough to strike a man while standing on any part of the car? A. Yes, it is.

"9. Do you find that the railroad company used any guards or provided any warnings for employés to apprise them of the danger at this bridge? A. No.

"10. Is it gross and wanton carelessness on the part of the company, as respects the safety of its employés, to erect a bridge with the braces in the position they occupy on the bridge in question? A. Yes.

"11. Was this a standard bridge, and of approved construction, having regard to the safety of employés, as claimed by the railroad company? A. No."

The railroad company moved to set aside the verdict, and for a new trial, on the grounds of irregularities on the part of the court and the jury during the trial; misconduct of the plaintiff and his counsel during the trial; and excessive damages; and that the verdict is not sustained by sufficient evidence, and is contrary to law. The court overruled the motion, and gave judgment in favor of *Irwin* for the sum of $12,000. Exceptions were taken to the rulings of the court on the motion, and in the rendition of judgment. *The Railroad Company* brings the case to this court for review.

*J. H. Richards*, and *Harris, Harris & Vermilion*, for plaintiff in error.

*Houston & Bentley*, for defendant in error.

45 — 37 KAS.

The opinion of the court was delivered by

JOHNSTON, J.: It is earnestly contended by the plaintiff in error that the evidence is insufficient to sustain the finding that the railroad company was negligent in the construction and maintenance of the bridge which occasioned the injury; and that even if the company was negligent, the testimony shows that at the time of the accident Irwin was not exercising that prudence and care which was required of him, and hence ought not to recover. The testimony shows that the bridge in question is built over the Walnut river, about one-half mile from the station at El Dorado. It was so constructed that the top beams were sufficiently high to permit a person standing on the center of the top of a box car or caboose to pass through without colliding with these timbers, but there were braces, extending from the posts of the bridge to the top beams, which were only about four feet above the outer edge of the top of such cars. A person of ordinary height standing in the center of a car could pass through the bridge with safety, but was in danger of being swept from the cars if he stepped a foot or two from the center. Irwin was the conductor of a freight train, and was standing on the top of the caboose, at the side of the cupola, when he was struck by one of these overhead braces. The brace was so low that it struck him below the shoulders, and, according to the testimony of one witness, it was only three feet and nine inches above the outer edge of the roof of the caboose. It was the duty of the railroad company to use ordinary care in providing tracks and bridges that would be reasonably safe for its employés in discharging the duties they were called on to perform. Brakemen and conductors of freight trains are frequently required to be on the top of the cars, both night and day. The hazards of such positions are great, and the duty of the company required that its employés should not be subjected to unnecessary perils from structures over and along the track which, by proper diligence on the part of the company, might be changed or removed. The necessity for a contrivance as

1. Track and bridges; duty of company.

dangerous as the overhead structure of this bridge was, is not apparent. Indeed, it seems to have been otherwise planned, but was botched in the construction. E. S. Farnsworth, a witness for the company, and the engineer who furnished the plan for the bridge, stated that it was intended to be a standard Howe truss bridge in every particular, and that it was constructed of the usual height and width, and that the braces were a necessary part of the bridge, and that it was customary to put them in bridges in the same position and place as they were placed in the bridge at El Dorado. However, he stated that if the bridge was built according to the plans, he could not conceive how an employé on the caboose of a train could be struck by one of these braces; and he further stated that it would be more than six feet from the outer top edge of an ordinary caboose to the braces in the bridge. F. W. Tanner, the general foreman of bridges for the railroad company, testified that he had had fifteen years' experience in building and constructing railroad bridges. He was asked: "Could these braces in a bridge properly constructed with due regard to the safety of employés be low enough to strike a man of ordinary size on top of a car of ordinary height and width?" He answered: "They should not, providing the car was on the track and passing through the bridge as it should do." James Standard, an assistant superintendent of bridges for the railroad company, of nineteen years' experience in the building and construction of railroad bridges, stated that a railroad bridge should be so constructed that there would be no danger of a man striking the braces on any part of an ordinary car. This testimony would indicate that it was neither necessary nor intended in the first instance that the bridge should be so low as to be dangerous for employés to stand erect upon the top of any of the ordinary cars. It cannot be doubted that these facts were sufficient to go to the jury on the unsafe and unsuitable character of the bridge, and also sufficient to sustain the finding of the company's negligence in so constructing and

maintaining it. With reference to such structures, Mr. Beach, in his work on Contributory Negligence, p. 364, says:

"If the roof or overhead structure of the bridge is so low that it will strike a brakeman standing erect on the top of his train, it is an essentially murderous contrivance, and it is not creditable to our jurisprudence that such buildings are not declared a nuisance. There is nothing in the reports worse than the cases that sustain the railway corporations in building and maintaining these man-traps."

The same question was before the supreme court of Indiana, where a brakeman was swept from the top of a freight train by a low bridge, and severely injured. He had no knowledge that the bridge was low, or that it would interfere with the performance of his duty on top of the train while passing through. It was there urged that the defect, if any, was open and obvious, the dangerous character of which he had opportunity to ascertain, and the risk of which he assumed. The court ruled that it was the duty of the railroad company to construct and maintain its roadway and overhead structures in such a condition that an employé can perform all the duties required of him with reasonable safety; and as the bridge was insufficient in height, of which fact the employé had no knowledge, the injury was the result of the company's negligence, and for which the employé was entitled to recover. The court referred to the cases relied on by the railroad company in the present case, but refused to follow them. (*B. O. & C. Rld. Co. v. Rowan*, 104 Ind. 88; same case, 23 Am. & Eng. Rld. Cases, 390; same case, 3 N. E. Rep. 627.)

*C. & N. W. Rld. Co. v. Swett, Adm'r*, 45 Ill. 197, was an action to recover damages for causing the death of a fireman. The train on which he was working was precipitated through a bridge which was defectively constructed and maintained, and he was immediately killed. The court, in speaking of the duty of the company, and the peril which the employé assumed when he entered its service, said:

"The peril consisted in the defective construction of the road and its appurtenances, its culverts and bridges, which the fireman could know nothing about, and which he could

not have discovered by the exercise of ordinary precaution and prudence; indeed, he was not required to know anything about that; the implied undertaking of his employers, that the road and culverts and bridges were properly constructed and safe for the passage of trains, was sufficient for him.   He embarked in the service on the faith that it was a properly constructed road, and that his superiors were in the exercise of all the diligence necessary to keep it in good repair.   .   .   . There is no rule better settled than this, that it is the duty of railroad companies to keep their road and works, and all portions of the track, in such repair and so watched and tended as to insure the safety of all who may lawfully be upon them, whether passengers, or servants, or others.   They are bound to furnish a safe road, and sufficient and safe machinery and cars.   For their failure in this, and their employés not knowing the defects, and not contracting with express reference to them, the companies must be held liable for such injuries as their employés may suffer thereby."

The same doctrine was announced in *Ill. Cent. Rld. Co. v. Welch*, 52 Ill. 183, where the plaintiff was injured while in the discharge of his duties as brakeman of a freight train, by an awning projecting from a station house to a dangerous position, and which knocked him from the top of a car while engaged in the discharge of his duty.   It was held that this was such negligence as made the company liable for the damages sustained.   *C. & I. Rld. Co. v. Russell*, 91 Ill. 298, was a case where a railroad company permitted a telegraph pole to stand for a period of three years so near to a side track that it was within eighteen inches of passing freight trains, so that a brakeman in descending from the top of a freight car while in motion, in the performance of his duty, came in collision with the pole, and was thrown from the car and killed.   It was held to be culpable negligence in the railroad company, to permit, for so long a time, such an obstruction to be in such close proximity to its track.   *C. & A. Rld. Co. v. Johnson*, 4 N. E. Rep. 381, was an action to recover for a personal injury suffered by a brakeman on a freight train while passing through a covered bridge.   In affirming a judgment in favor of the brakeman, the court approved of an instruction to the effect that where a railroad company

constructs a bridge along the line of its road, it should build it of sufficient height so that persons employed by the railroad company as brakemen, and who are required to go upon the top of freight cars in discharging their duty as brakemen, while going through a bridge may pass through and under the bridge without danger to their personal safety; and that the law does not require of a brakeman that he should absolutely know all the defects of construction and all the obstructions there may be along the line of the road. In *Clark, Adm'x, v. St. P. & S. C. Rld. Co.*, 28 Minn. 128, a brakeman was killed by striking an awning which projected over a side track in such a position that its lowest projection would strike a man of ordinary height on the head, while it would not come in contact with a man standing eight inches or a foot aside from the center of the car. The brakeman was struck by the corner of the awning while engaged in the performance of his duty in moving freight cars upon the side track. The court held that the railroad company failed in its duty to the brakeman, and that if the brakeman had no knowledge of the peril the company would be responsible for the injury. (See also *Greenleaf v. D. & S. C. Rld. Co.*, 33 Iowa, 52; *Allen v. B. C. R. & N. R. Co.*, 57 id. 623; *Dorsey v. Construction Co.*, 42 Wis. 583; *Walsh v. Oregon Rly. Co.*, 10 Ore. 250; *H. & T. Rly. Co. v. Oram*, 49 Tex. 342.) The doctrines of these authorities more clearly accord with our views than do some of those cited by the plaintiff in error. Most of the latter, however, were disposed of on the theory that the employé had actual knowledge of the peril which he encountered. In this case the jury have said, and not without testimony, that Irwin had no knowledge nor opportunity to know of the dangerous character of the bridge. It is true that he had run over the road and through the bridge daily for three months preceding the accident. He knew of the existence of the bridge, and that it was constructed with overhead timbers, but it does not necessarily follow that he was acquainted with the proximity of the braces to the top of the caboose or cars. When he entered

**2. Employe— hazards — extent of knowledge.**
the service of the company he assumed the ordinary risks incident to the service; and if he enters or continues in the service with a knowledge of the risk or danger, and without objection, he must abide the consequences. ( *Jackson v. K. C. L. & S. K. Rld. Co.*, 31 Kas. 761; *K. P. Rly. Co. v. Peavey*, 34 id. 472; *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 id. 129.) The law, however,

**3. Defect, known to company— unknown to employe— liability.**
does not require that an employé shall know of all defects or obstructions that may exist on the road, or in the service in which he is engaged; and it cannot be said that the peril in this case was so obvious and patent that Irwin must have known it. He had a right to assume that the company had done its duty and placed its track in such a condition that he could perform his duties with reasonable safety. The fact that a portion of the bridge was sufficiently high to clear a man's head while standing on top of a car, and other parts were not, made the bridge all the more deceptive and dangerous. Irwin, being a conductor, was not called to the top of the train so frequently as brakemen were, and hence would be less likely to notice the lowness of the timbers in the bridge. He testified that he supposed the bridge was sufficiently high so that it would be safe to stand on any part of the car. Several brakemen and others who passed through the bridge stated that they could not say from looking at the bridge that the braces were so low as to strike or injure one who was on top of a train. Men of experience say that it is a very difficult matter to tell exactly how high an object is above a moving train. The smoke of the engine, and the side or swaying motion of the cars, render it hard to see and comprehend the proximity of the overhead timbers of a bridge, and this is very well shown by the widely-differing statements of the witnesses respecting the height of the braces in question. It does not appear that Irwin had been on top of the cars while passing through the bridge more than once before the time of the accident, and he says that he knows of no other bridge on the road with braces so low as they are in this one. The plaintiff had unloaded

freight from his train at the station at El Dorado, and in ac-
cordance with the directions of the train master had backed
down half a mile in order to make a run over a high grade,
and over the crossing of the Atchison, Topeka & Santa Fé
railroad, which was a few yards beyond the station. A train
on that road was approaching the crossing, and Irwin sent
one of his brakemen to flag the crossing, while he ran back
over the cars of his train to the caboose. He remained on
top of the caboose to watch the Santa Fé train in order to give
the necessary signal and avoid a collision. It seems that on
the previous day his train had almost collided with the Santa
Fé train at the same crossing. It is said that Irwin might
have required a brakeman to perform the duty on top of
the caboose instead of going there himself; but it appears that
his action in that respect was not outside of the scope of his
duties. Under all the testimony, we cannot say that the dan-
ger was so open and obvious that Irwin knew or should have
known of it; nor can we say that he was guilty of contribu-
tory negligence. Whether he acted with ordinary
care, is a mixed question of law and fact which
was proper for the determination of the jury,
taking into consideration all the facts and circumstances. The
jury has passed upon the question on competent testimony,
and we are unable to say that its finding is unwarranted.
(*Huddleston v. Lowell*, 106 Mass. 282; *Conroy v. Vulcan Iron
Works*, 62 Mo. 35; *Dale v. Railway Co.*, 63 id. 455; Wood
Mas. & S., §§ 376, 385, and cases heretofore cited.)

4. Ordinary care
—injury—
finding, not
disturbed.

Complaint is made of the ruling of the court in refusing
several instructions requested by the plaintiff in error. The
third was a declaration that the company would not be liable
if Irwin could have protected himself by the use of ordinary
care. The court stated this rule favorably enough for the
company, where it instructed that —

" If the bridge in question was of sufficient height and
width to enable employés, while in the discharge of their duties
on top of freight and caboose cars in use at the time on de-
fendant's road, to pass through it with safety by the use of
ordinary care to protect themselves from injury, then defend-

ant would not be liable for plaintiff's injury. The law does not require the defendant to furnish a bridge which the plaintiff could not be injured on, but is only required to furnish such a bridge as the plaintiff could pass through in safety, in the performance of his duties to the company, while exercising ordinary care for his personal safety."

The ninth request related to the knowledge of Irwin, holding that if he had knowledge of the bridge, or reasonable opportunity to know of its proximity to the top of the cars, he could not recover. The instruction as drawn was not exactly in harmony with the view we have taken, but the company has no cause to complain with respect to this rule, as the twentieth and twenty-second instructions given by the court stated that if he knew or had opportunity to inform himself of the condition of the bridge and the position of the braces, and their proximity to the top of the caboose, he could not recover; and further, that if he had a fair opportunity for acquiring a knowledge of the condition of the bridge and its danger while passing thereunder, if there was any, but ignored such knowledge or opportunity, and neglected to avail himself thereof, he cannot derive any advantage from such ignorance or want of knowledge, but his rights are to be determined the same as if he possessed the knowledge he might have acquired by the reasonable exercise of his faculties. The tenth request related to the duty of the company in the construction of the bridge, which duty was stated more fully and correctly in several instructions that were given. Objections are made to the twentieth and twenty-third instructions that were given. They relate to the rule fixing the liability of the company where an employé has knowledge of the danger which he encounters. We do not think the criticisms of counsel are justified. But as the jury has expressly found that Irwin had no knowledge of the defect in the bridge, these instructions become unimportant.

We have examined the objections to the admission of evidence, and it is sufficient to say that we do not regard the rulings to have been prejudicial to the rights of the plaintiff in error.

One of the grounds for a new trial was the misconduct of counsel in his closing argument. The affidavits which were filed in the case show that the remarks of counsel were outside of the evidence, and were clearly improper. However, no objection to the remarks was made, except to the statement that Irwin would wait in misery and pain for the coming-in of the jury, and that he hoped they would give more than the jury did before, to pay for the long trouble and the long work. The objection to this statement was promptly sustained by the court, and the attention of the court below was not called to any other of the objectionable statements. Of course the arguments should be confined to the facts brought out in the evidence, and it is error to allow counsel, over objections and exceptions, to discuss matters foreign to the evidence and prejudicial to the opposing party. But in exercising its appellate jurisdiction, this court is limited to the review of the alleged errors committed by the district court; and generally speaking, the attention of the trial court should be called to the improper language of counsel, and a ruling had upon the objection, in order to present the question here. There being no exception to the ruling on an objection, nor any unsustained objection, we cannot say the court erred. (*The State v. McCool,* 34 Kas. 613, 617.)

5. Misconduct of counsel; review, when.

Some other objections were made, all of which have been examined, but we find nothing in the case that will justify a reversal, and hence the judgment of the district court will be affirmed.

All the Justices concurring.