The Atchison, Topeka & Santa Fe Railroad Company v. Anna Rowan.

1. Railroad Bridge, *Unsafe for Brakemen—Negligence—Company, When Liable.* The maintenance of a bridge over a railroad track so low as to make it unsafe for brakemen to discharge the duties required of them upon the top of a train is *prima facie* negligence; and where injury results from that cause, the company will be held liable, unless the injured employee is chargeable with contributory negligence, or with the assumption of the risk of such danger.

2. Low Bridge—*Contributory Negligence—Question for Jury.* A brakeman had been running over a section of railroad for more than a year on which all the bridges but three were sufficiently high to permit him while standing on the top of any of the freight-cars to pass under in safety. He could also safely pass under the three low bridges when standing upon the ordinary freight-cars which were in use. Furniture-cars had been recently introduced which were so high that he could not safely stand erect while passing under the low bridges. While in the discharge of his duties on the top of a train, he stepped upon a furniture-car as he approached one of the low bridges and was knocked off by the the overhead timbers of the bridge and killed. He had ridden over the road almost daily for the preceding year, and upon at least 60 trains, in each of which there was one or more of the high cars, but it did not appear that he had ever been upon one of the high cars while passing under a low bridge, nor that any warning had been given to him that he could not safely stand upon them. No telltale or cautionary signals had been placed upon the bridges, nor did it appear that he had actual knowledge of the danger. *Held*, that whether he knew or should have known of the risk, and whether he was guilty of contributory negligence in not ascertaining by measurement or accurate observation that he could not pass safely under the overhead timbers of the low bridges while standing erect on the furniture-car, is a question of fact for the jury.

3. New Trial—*Affidavits—Practice.* To obtain a new trial for misconduct of the prevailing party, the motion must be sustained by affidavits showing the alleged charge to be true, and where it is not so supported, and the motion is denied, the misconduct is not available as a ground of reversal.

*Error from Sedgwick Court of Common Pleas.*

ACTION brought by *Anna Rowan* against *The Atchison, Topeka & Santa Fe Railroad Company* on account of the death of her husband, who was killed while in the discharge of his duties as a brakeman of a freight-train of the railroad company. It was alleged that his death resulted from the negligence of the company in constructing and maintaining a low bridge; that there was insufficient space between the top of the cars and the overhead timbers of the bridge, and that, while he was attending to his duties upon the top of a car, he came in contact with the top of the bridge and was killed, without fault or negligence on his own part. A trial was had with a jury, and upon the testimony introduced the following findings of fact were returned:

"1. From the evidence, how long at least had bridge No. 154, which killed W. H. Rowan, been built and maintained by the defendant at the time of Rowan's death? Ans. Seven years.

"2. During the time it was maintained, as shown by the evidence, about how high was it from the top of the rails to the bottom of the overhead timbers? A. Eighteen feet and one-quarter inches.

"3. At the time when said bridge was constructed, and for some years thereafter, is it not a fact that the bridge was sufficiently high to enable any brakeman of ordinary height to stand upon top of any cars then in use upon the defendant's road with safety, while the same were passing through such bridge, so far as the danger of being hit is concerned? A. Yes."

"5. Is it not a fact that such bridge at the time of Rowan's death was 104½ feet in length? A. Yes.

"6. Is it not a fact that the west end of the bridge at the time of Rowan's death was 6,369½ feet distant from the depot at Peabody, Kas.? A. Yes.

"7. Is it not a fact that at the time of Rowan's

death the west end of the bridge No. 154 was 2,100 feet from the only whistling-post between it and the depot at Peabody?     A.   Yes.

"8.   When this bridge was built, and during the time it was maintained up and prior to Rowan's death, what was there about the top of it and its overhead timbers, outside of the question of height, which was in any manner or way defective, either in the manner of its original construction, or as it was maintained during all the times referred to in question No. 1, so far as the evidence discloses, and if there was anything, state fully what it was?     A.   Nothing.

"9.   Is it not a fact that Rowan entered the service of the defendant company in October, 1887?     A.   Yes."

"11.   Is it not a fact that Rowan remained in the service of the company from the time he entered it up to the date of his death, except during the months of January, March and April, 1888?     A.   Yes."

"13.   Is it not a fact that, from May 17, 1888, to the date of his death, Rowan worked for defendant either as brakeman or conductor on freight-trains?     A.   Yes.

"14.   Is it not a fact that, during the time referred to in the last question, the plaintiff Rowan worked on that portion of the main line of defendant which lay between Emporia and Nickerson?     A.   Yes."

"16.   During the period of time that Rowan worked on that portion of the main line of the defendant company, which is described in question No. 14, how many times in a week, on a fair average, did he go over that portion of the main line between Emporia and Newton?     A.   Six times.

"17.   During the time Rowan worked for the defendant on that portion of the main line described in question 14, is it not a fact that his run would usually consist of going from Emporia to Newton or Nickerson, and returning from such point to Emporia?     A.   Yes."

"19.   If the jury answer question 17 in the affirmative, they may state if it is not a fact that the run from Emporia to Newton or Nickerson and back was usually made within 24 hours?     A.   Yes."

"21. How many runs in a week, on an average, did Rowan, prior to his death, make over that portion of the main line between Emporia and Newton, while he was working on that portion of such line? A. Six times a week.

"22. Is it not a fact that Rowan was killed by bridge No. 154? A. Yes."

"24. At the time of Rowan's death was not bridge No. 154 18 feet and one-quarter inches high, from top of rail to the under side of the overhead timber? A. Yes.

"25. Was not Rowan, immediately prior to being killed, sitting down on the front end of the fifth car from the engine of the train he was on? A. Yes.

"26. Is it not a fact that Rowan walked back from the front end of the fifth car from the engine, and stepped up over it on to the front end of the sixth car from the engine, immediately prior to his death? A. Yes.

"27. Is it not a fact that Rowan was struck by the bridge just as he stepped up on to the front end of the sixth car from the engine? A. Yes.

"28. Is it not a fact that the sixth car from the engine was number 14500 and lettered 'A. T. & S. F.' or 'A. T.'? A. Yes."

"30. Is it not a fact that the car plaintiff was on at the time he was struck by the bridge was a large furniture-car? A. Yes.

"31. Is it not a fact that the car referred to in the last question was about 13 feet 11 inches high? A. Yes."

"33. Is it not a fact that the car referred to in question No. 30 had been in use in the operation of defendant's road since the fall of 1887? A. Yes."

"35. Is it not a fact that Rowan was conductor on an extra freight-train on November 13, 1888, which contained, among other cars, this car, No. 14500? A. Yes.

"36. As such conductor did he not see this car, and take down in his book the number and letters of it? A. Yes.

18—55 KAS.

"37. Is it not a fact that on July 13, 1889, Rowan was a brakeman on the train which contained, among other cars, this car, No. 14500, lettered 'A. T. & S. F.,' and called 'A. T.'? A. Yes.

"38. If the jury answer the last question in the affirmative, they may state whether Rowan was a rear or head brakeman on such train. A. Head brakeman.

"39. If jury answer question 37 in the affirmative, they may state the position of this car, numbered 14-500, on that train, with respect to what car it was from the engine. A. Third car from engine.

"40. What kind of a car was the fifth car from the engine, on that car Rowan was upon at the time of his death, as to being a box, stock, or flat car? A. A palace stock-car.

"41. The jury may state the height of the car referred to in the last question. A. Twelve feet.

"42. About how high was Rowan at the time of his death? A. About five feet.

"43. If Rowan had staid upon the fifth car from the engine, standing up upon it, at the time of his death, instead of stepping upon the sixth car, would he not have passed over the bridge in safety, so far as the question of being struck by it was concerned? A. Yes.

"44. At what rate of speed was the train Rowan was on, at the time of his death, traveling per hour at that time? A. Twenty-five or 27 miles.

"45. At what rate of speed was Rowan traveling when going over the front end of the fifth car from the engine, immediately prior to his death, to the end of the sixth car, where he was struck? A. About three miles per hour.

"46. What is the average length of a freight-car on defendant's road, including box, flat, stock, and furniture-cars? A. About 30 feet.

"47. About what was the length of the fifth car from the engine on that train? A. About 30 feet.

"48. About what was the distance from the front end of the car on which Rowan was struck to the engine? A. One hundred and sixty-five feet.

"49. When Rowan got up from the front end of the fifth car from the engine to walk back to the car where he was struck, about how far was the engine from bridge 154? A. About one-quarter of a mile.

"50. At the time referred to in the last question, about how far was Rowan from this bridge at the time he got up to walk back? A. About 1,500 feet.

"51. About how far from the caboose was it to Rowan when he got up to walk back to the car where he was struck? A. Five hundred and twenty-eight feet.

"52. What, if anything, prevented Rowan, as he walked back to the furniture-car upon which he was struck, from seeing and realizing that it was a higher car than the one he was upon; and if anything, state fully? A. Nothing disclosed in evidence.

"53. Could he not see that this furniture-car was over a foot higher than the one he was walking upon as he approached it? A. Yes.

"54. Is it not a fact that Rowan knew and realized that this furniture-car upon which he met his death was over a foot higher than the one he was upon at the very time and immediately prior to his stepping from the fifth car from the engine up to and upon it? A. No evidence disclosed the fact that he did.

"55. Is it not a fact that defendant, at the time of the death of Rowan, had only about a hundred of these high furniture-cars in use upon its road, belonging to it? A. Yes."

"57. If the jury answer question 55 in the affirmative, they may state if 50 of these cars were not cars numbered with even numbers from 14500 to 15599, and which had been built in the shop at Topeka? A. Yes.

"58. Had not these cars referred to been in use on defendant's road from the spring of 1888? A. Yes.

"59. If the jury answer question 57 in the affirmative, they may state if it is not a fact that 50 of these cars, numbered by even numbers from 19400 to 19499, were built for it in Indiana and delivered to it in the spring of 1888, or between January and August of that year? A. Yes.

"60. Were not the cars referred to in the last question 13 feet 11¼ inches from the top of the rail to the top of the running-board when they were built? A. Yes.

"61. Was and is not car 14500 of about the same height as the cars referred to in the last question? A. Yes."

"63. At the time of Rowan's death what was the height of the standard box car owned and used by the defendant upon its road, from the top of the rail to the top of the running-board? A. Eleven feet.

"64. Prior to the fall of 1887, had defendant any of these high furniture-cars in use? A. No.

"65. Prior to the time referred to in the last question, had the defendant in use, of its own, any cars upon the top of which Rowan could not have ridden over bridge 154 standing up in perfect safety? A. No."

"68. Is it not a fact that Rowan, at the time of his death, was familiar with the furniture-cars owned by the defendant and in use on its road? A. From the evidence, no.

"69. Is it not a fact that, prior to his death and from May 17, 1888, Rowan had been a brakeman or conductor upon at least 30 freight-trains, having one or more furniture-cars belonging to the defendant of the 50 numbered by even numbers from 14500 to 14599? A. Yes.

"70. Is it not a fact that, within the period mentioned in the last question, Rowan had been either brakeman or conductor upon at least 30 freight-trains having one or more furniture-cars of series numbered from 19400 to 19499? A. Yes.

"71. Is it not a fact that Rowan, prior to his death and during the time he worked for the defendant as brakeman or conductor on the main line between Emporia and Newton, had been over this bridge practically at all times of day and night? A. Yes.

"72. Is it not a fact that, prior to the death of Rowan, he, as brakeman, had been over bridge No. 154 practically at all times of day and night with trains that had cars in them of either one or the other

of the two series of high furniture-cars heretofore referred to? A. Yes.

"73. Was there any duty which Rowan was intending to perform or which he started to perform when, immediately prior to his death, he walked over the top of the fifth car from the engine and stepped up on to the sixth car ? A. Yes.

"74. If the jury answer the last question in the affirmative, they may state what such duty was, stating fully ? A. According to defendant's rule No. 128, deceased was attending to his duties as brakeman.

"75. When Rowan was sitting on the top of the fifth car from the engine, immediately prior to his getting up and walking back to the sixth car, where he was killed, what, if anything, prevented him from knowing at the time of his getting up to walk back, and during the time that he was walking back, that the train was approaching bridge 154, stating fully ? A. Nothing, unless something not disclosed in evidence to the jury.

"76. Did Rowan, immediately prior to his death, and while walking back over the fifth car from the engine to the sixth car, know or realize that he was approaching bridge 154 ? A. No.

"77. Is it not a fact that, at this time referred to in the last question, and for a long time prior thereto, bridge 154 had generally been known among railroad men working on that division as a low bridge ? A. No.

"78. Is it not a fact that, at the time of and prior to Rowan's death, and during all the time that he worked on this main line between Emporia and Newton, that there were two other bridges between said points which were constructed like bridge 154, and were of practically the same height ? A. Yes.

"79. Is it not a fact that Rowan did not see and had forgotten the position and location of bridge 154 at the time he got up in the front end of the fifth car from the engine, and walked back to the point where he was struck? A. No.

"80. What duty called or required Rowan, im-

mediately prior to his death, to be up on top of the car prior to the engine whistling for the station at Peabody, stating fully? A. According to defendant's rule 128, deceased was attending to his duties as brakeman.

"81. What duty, if any, required Rowan to leave the fifth car from the engine to go upon the top of the high furniture-car at the time he did go and met his death, stating fully? A. As to what duty: Not disclosed in evidence outside defendant's rule No. 128.

"82. What was Rowan earning at the time of his death? A. From $55 to $70 per month.

"83. What proportion of his earnings was he contributing to the support of his family? A. All except what was necessary individual expenses.

"84. About what were his personal expenses at such time? A. Do n't know from evidence.

"85. Is it not a fact that such bridge was located between Emporia and Newton? A. Yes.

"86. Is it not a fact that, during the entire time Rowan run over that portion of the line between Emporia and Newton, he knew where bridge 154 stood and was located? A. Yes."

"90. Is it not a fact that, to any person of ordinary care and prudence occupying the position of a brakeman who had run over the road where this bridge was as long as Rowan had, and who had seen as many of the high furniture-cars as Rowan had seen, it would have appeared dangerous to attempt to ride over that bridge on the top of one of these furniture-cars going at the rate of from 25 to 27 miles an hour? A. Yes; if he had time to observe at the right time and moment.

"91. Is it not a fact that, from all the evidence in this case, Rowan had apparently forgotten and did not remember the position and location of bridge 154 at the time he got up from where he was sitting on the fifth car from the engine and walked back to the point where he was killed? A. From the evidence, no.

"92. As Rowan was walking back on the top of a palace stock-car to the furniture-car, did he know or

realize that the train was approaching this bridge?
A. No.

"93. What duty did Rowan have to perform or at-
tend to immediately prior to his death which would,
or in any way could, have distracted his attention
from the fact that the train was approaching this
bridge?    A. Not shown from the evidence.

"94. Is it not a fact that the palace stock-car,
which was the fifth car from the engine on the train
on which Rowan was killed, was 12 feet high, from
top of rail to top of running-board?    A. Yes.

"95. As a matter of fact, would it not have been a
very imprudent act for any brakeman sitting down on
the top of any of defendant's palace stock-cars as it
was approaching bridge 154 at the rate of 27 miles
an hour to have gotten up as the train got within a
quarter or a half a mile of the bridge and then walk
across the top of such car, with his back to the bridge,
to a high furniture-car and step upon it without look-
ing to see where the bridge was?    A. No evidence to
show that deceased thought it imprudent."

Upon the return of the special findings, the railroad
company requested the court to require the jury to
give more definite and direct answers to special ques-
tions Nos. 74, 80, 81, and 96, but the request was
overruled.    The general verdict of the jury was in
favor of the plaintiff, and her damages were assessed
at $10,000.    The *Railroad Company* excepted to the
rulings and the judgment, and brings the case here
for review.

*A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*J. D. Houston,* and *W. E. Brown,* for defendant in
error.

The opinion of the court was delivered by

JOHNSTON, J.: William H. Rowan came to his death
on August 24, 1889, while discharging his duties as a

brakeman on a freight-train of the railroad company. It is conceded that he was knocked from the top of a freight-car by the overhead timbers of a railroad bridge located near Peabody, and that his death resulted almost instantly from the collision. He entered the service of the company in October, 1887, and continued in that service as brakeman or extra conductor the greater part of the time until his death. For more than a year before he was killed he made frequent trips between Emporia and Nickerson, and the low bridge with which he collided is between these points. The space between the top of the rail and the under side of the overhead timbers of the bridge was 18 feet and one-quarter of an inch, and was sufficient so that a man standing erect on top of the ordinary freight-car in use could pass in safety. The standard box car owned and used by the company was 11 feet from the top of the rail to the top of the running-board, and the palace stock-cars, many of which were used, were 12 feet high, while the furniture-cars, which had been recently introduced and which were occasionally used, were 13 feet and 11¼ inches high. Rowan, who was about five feet high, could stand erect upon the standard or stock-cars and pass through the low bridge with safety, but it was not of sufficient height to permit him to pass under it while standing on the top of a furniture-car. A rule of the company provided that every brakeman must be on the top of his train in passing stations or railroad crossings, and as the train was approaching the station at Peabody, Rowan was properly upon the top of the train when he was killed. A considerable number of the high furniture-cars had been in use on the road of the company for more than a year before Rowan's death occurred, and in fact he had been a

brakeman or conductor upon at least 60 freight-trains in which there was one or more of these high furniture-cars. During the time that he was employed by the company on the main line between Emporia and Nickerson he had been over this bridge practically at all times of day and night, and between these points there were two other bridges of the same height. The morning of the casualty was bright and clear, and as the train approached the station and the bridge, Rowan, the head brakeman, who was sitting on the top of a stock-car, arose and walked back over that car, and as he stepped upon the next, which was a furniture-car, the back of his head came in contact with the top of the bridge and he was knocked down and killed.

It is contended, first, that the company was free from negligence in maintaining the low bridge and in using high cars which pass over it; and, second, that under the facts of the case, Rowan had opportunity to observe the height of the bridge, and to know that it would be dangerous to pass under the same while standing upon a furniture-car, and that he must be deemed to have had knowledge of the danger and to have assumed the risk, and was, therefore, guilty of contributory negligence in not looking when approaching the bridge, and in placing himself in a position of manifest danger.

It was the duty of the railroad company to construct and maintain its road and the bridges thereon in such a manner and condition that its employees might perform all the labor and duties required of them with reasonable safety, and a person entering the service of the company has a right to assume that this obligation has been discharged. It must be regarded as the settled law of this state that the maintenance of a bridge,

such as the one in question, so low as to make it un-
safe for the trainmen to perform the duties
required of them, is *prima facie* negligence,
and where injury results to an employee
from such cause the company is held liable,
unless the injured employee is chargeable
with contributory negligence, or with the assumption
of the risks of such danger. (*Railroad Co. v. Irwin*, 37
Kas. 701.) Can it be said, as a matter of law, that
the risk was assumed by Rowan, or that the injury
was the result of his own contributory fault? It is
true that he assumed the ordinary hazards that neces-
sarily accompany his employment, and of any unusual
risks of which he had been warned or had knowledge.
It is contended that, as Rowan had frequently passed
under this bridge and two others of the same height,
he knew, or should have known, that the bridge was
too low to permit him to stand upon the top of furni-
ture-cars while passing through or under the bridge.
It is insisted that but one inference can reasonably be
drawn from the testimony, and therefore that the
court should declare as a matter of law that no recov-
ery can be had in the case. We are of opinion that the
testimony was sufficient to send the case to the jury,
and that it cannot be said that the findings of fact do
not justify a recovery. When the injury and the fault
of the company had been proved, the burden of show-
ing that Rowan had knowledge of the risk, or that he
failed to exercise ordinary care in the matter, rested
upon the company. In the absence of evidence to the
contrary, it will be presumed that Rowan was free from
contributory negligence, as it is held "that a jury may
infer ordinary care and diligence on the part of an
injured person from the love of life or the instinct of
self-preservation and the known disposition of men to

*1. Railroad bridge, unsafe for brakemen; negligence; company, when liable.*

avoid injury." (*Dewald v. Railroad Co.*, 44 Kas. 591.) As we have seen, the cars were of unequal height; those longest in use were the lowest, and Rowan could safely pass through the low bridge while standing on top of such cars. The high cars have recently been brought into use, and it is not shown by any direct testimony that the attention of Rowan was ever called to the danger of riding through the low bridge on top of these. No telltales or cautionary signals were placed near to nor on the bridge in either daytime or night-time to warn trainmen of their approach to the bridge and to danger. It does not appear that there was any change of the rules regulating the conduct of the men when the high cars were introduced, nor that notice of any kind was given to Rowan that the space between the top of these high cars and the overhead timbers of the low bridge was insufficient to permit him to pass over the top of the cars in the discharge of his duties, as he had heretofore done. There is nothing to show that Rowan had ever been upon the top of the high cars in any position while passing under the low bridges, and nothing to indicate that his attention was drawn to the proximity of the high cars to the bridge with which he collided. It is true, that where dangers are obvious and can be readily observed by anyone by the exercise of ordinary care and prudence in the use of his senses, a specific notice is not in all cases essential to defeat a recovery; but the testimony in this case does not convince us that we should say as a matter of law that Rowan was chargeable with a knowledge of the peril, and that his failure to take the necessary steps to avoid the injury is a bar to any recovery. It does not appear that the danger was actually known to him, and the testimony given shows that it is not easy to determine from the top of

a moving train the space between the train and the top of a bridge. In *Railroad Co. v. Irwin*, 37 Kas. 711, it was said that —

" Men of experience say that it is a very difficult matter to tell exactly how high an object is above a moving train. The smoke of the engine and the swaying motion of the cars render it hard to see and comprehend the proximity of the overhead timbers of a bridge, and this is very well shown by the widely-differing statements of the witnesses respecting the height of the braces in question."

The brakeman who accompanied Rowan, and who was the principal witness in the case, testified that he had been over that run for more than a year, and yet he was unable to state the distance between the ordinary freight-car and the top of the bridge, or whether he could ride on top of the train without coming in contact with the timbers of the bridge. In response to another question, he did state that from his observation it would be hazardous to undertake to ride on the top of a furniture-car, but that he had ridden with the deceased over the line so frequently without carefully observing the intervening space only tends to show that Rowan may never have observed the proximity of the top of the bridge, nor appreciated the peril there was in riding upon the top of the furniture-car. If any notice or warning had been given that there was danger in riding on the top of furniture-cars, or if all the cars had been of the same height so that Rowan must have known that he could not stand erect while passing under the bridge, there would be ground for the contention of the company that the risk of the danger from the low bridge had been assumed, and the negligence of the company in that respect had been waived. It appears, however, that there were four grades of cars used of different heights, and it

can be readily seen that the difference in height of the several cars would easily deceive a trainman whose only information was derived by observation from the top of a swiftly-moving train. As Rowan was killed instantly, no direct testimony as to his knowledge can be obtained, and information on that point must be looked for elsewhere. While he had ridden over this section of the road for a year or more, no one has been produced to show that he had ever ridden upon one of the high cars, nor that his attention was ever called by anyone to the risk of so doing. The jury found that he was not familiar with the furniture-cars; also, that he was proceeding in the discharge of his duties when he was killed, and there are also findings which tend to show that he did not realize that he was approaching the bridge in question when he was killed, or comprehend the danger from riding on top of the furniture-car. So far as the testimony goes, he was not informed of the danger when the high cars were introduced; no change of rules relating thereto was promulgated by the company; no warnings were given or signals placed on or near the bridge; he had no actual knowledge of the risk; and, as it is one which is not easily observed from the top of a moving train, the question of whether he was guilty of contributory negligence in not ascertaining by measurement or accurate observation whether he could pass safely under the overhead tim-

2. Low bridge; contributory negligence; question for jury.

bers of the bridge while standing erect on the furniture-car is a question of fact rather than of law, the determination of which is necessarily for the jury. (*Railroad Co. v. Irwin*, 37 Kas. 701; *Railroad Co. v. Mortonson*, 63 Fed. Rep. 530. See, also, *Osage City v. Brown*, 27 Kas. 74; *Railroad Co. v. McCandliss*, 33 id. 366; *Railway Co. v.*

*Neiswanger*, 41 id. 621 ; *Dewald v. Railroad Co.*, 44 id. 586 ; *Darling v. Railroad Co.*, 24 Atl. Rep. 462 ; *Stirk v. Railroad Co.*, 79 Ga. 495 ; Beach, Cont. Neg., §§ 448–451 ; 16 Am. & Eng. Encyc. of Law, 465.)

Complaint is also made of the refusal of certain instructions requested by the railroad company, but an examination of the record satisfies us that those which were pertinent and important were embraced in the general instructions of the court, and that the case was fairly presented to the jury by the charge that was given.

It is also claimed that the court committed error in failing to require the jury to give a more specific and definite answer to the 96th question that was submitted to the jury. As will be seen, the question is very general and complex in its character, and for that reason it might have been refused in the first instance. Another objection to the question is that it omits the element of any knowledge of the risk by the employee. Aside from that, a large number of questions were submitted to and answered by the jury, and these covered the facts of the case so fully that there is little cause for complaint in that regard.

The misconduct of the attorney for plaintiff below in the argument of the case is assigned for error. The language used by him was certainly intemperate and improper. Nothing can be said in justification of such practice, and under some circumstances the misconduct would be deemed sufficient to compel a reversal of the judgment. As counsel was proceeding with the statements to which exceptions have been taken, an objection was made by the railroad company, when counsel for plaintiff below remarked, "I withdraw that statement, and ask the court to instruct the jury to disregard it." And thereupon the

court stated, "Yes, that will be done." While the remark of the court was made in the presence and hearing of the jury, no specific withdrawal was made, nor was any further notice taken of the misconduct. It was the duty of the trial court to keep counsel within the bounds of proper argument, and to promptly rebuke any attempt to bring in extraneous matters with a view of influencing or prejudicing the jury. It is generally held to be sufficient, where improper remarks are made in argument, that an objection is sustained by the court, and the jury are advised to disregard the objectionable remarks in their consideration of the case. Whether the action taken by the court in this instance was sufficient to cure the error may be a matter of some doubt. Assuming, however, that there was prejudice, the misconduct cannot, as the record stands, be made a ground of reversal. While one of the grounds alleged in the motion for a new trial was the misconduct of the plaintiff, it was not supported by affidavit. The statute specifically prescribes that to obtain a new trial for misconduct of the prevailing party, the motion must be sustained by affidavits showing the alleged charge to be true. (Civil Code, §§ 306, 309.) The improper remarks of counsel in argument have always been treated as misconduct, and as such it is imputable to the party for whom he appears; but as the plaintiff below failed to sustain the charge of misconduct in the manner prescribed by statute, the objection has not been properly saved, and is therefore not available as a ground of reversal.

3. New trial; affidavits; practice.

The judgment of the district court will be affirmed.

All the Justices concurring.